**Electronically Filed
Supreme Court
SCWC-15-0000446
21-MAY-2018
11:27 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

STATE OF HAWAIʻI,
Respondent/Plaintiff-Appellee,

vs.

BRIAN UNDERWOOD,
Petitioner/Defendant-Appellant.

SCWC-15-0000446

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-15-0000446; CRIMINAL NO. 14-1-00622)

MAY 21, 2018

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY POLLACK, J.

This case concerns the propriety of remarks made by a prosecutor in closing argument suggesting that opposing counsel attempted to induce the complaining witness to give false testimony during cross-examination.  There was no evidence in the record to support such an allegation, and the prosecutor's statements amounted to an unwarranted attack on the personal

character of defense counsel and, by extension, the defendant. The trial court did not rectify the issue through an adequate curative instruction, and the evidence against the defendant was not so overwhelming that we can conclude beyond a reasonable doubt that the allegation did not influence the jury's deliberations. We therefore vacate the defendant's convictions and remand this case for a new trial.

## I. BACKGROUND

On April 15, 2014, Brian Underwood was charged with the following offenses: count I, kidnapping in violation of Hawaii Revised Statutes (HRS) § 707-720(1)(e);[1] count II, carrying or use of a firearm in the commission of a separate felony in violation of HRS § 134-21;[2] and count III, abuse of family or household members in violation of HRS § 709-906(1).[3]

---

[1] HRS § 707-720(1)(e) provides in relevant part: "(1) A person commits the offense of kidnapping if the person intentionally or knowingly restrains another person with intent to: . . . (e) Terrorize that person or a third person[.]" HRS § 707-720(1)(e) (1993).

[2] HRS § 134-21 provides in relevant part as follows:

(a) It shall be unlawful for a person to knowingly carry on the person or have within the person's immediate control or intentionally use or threaten to use a firearm while engaged in the commission of a separate felony, whether the firearm was loaded or not, and whether operable or not

HRS § 134-21 (2011).

[3] HRS § 709-906(1) provided in relevant part: "(1) It shall be unlawful for any person, singly or in concert, to physically abuse a family household member . . . ." HRS § 709-906(1) (1993).

The allegations involved an incident that occurred on April 5, 2014.

A jury trial commenced on March 16, 2015, and the following evidence was adduced.[4]

At the time of the incident, the complaining witness (CW) lived with Underwood in his two-story apartment on Oahu. They had been dating for about ten months and living together for about three months. On the evening of April 4, 2014, CW received a message through online social media from a woman living on the mainland who claimed that she was in a relationship with Underwood. A week and a half earlier, CW had received a similar communication from a different woman living in Australia.

CW confronted Underwood about the purported relationships, and they ultimately decided that CW would move out the next morning.[5] After Underwood went to sleep, CW printed out the approximately 30 messages she had received from the women, including pictures of text conversations between the women and Underwood, and placed them in various places throughout their bedroom.

_____

[4]     The Honorable Glenn J. Kim presided.

[5]     Underwood offered to pay for a hotel room so that CW could leave immediately, but they decided to wait until the morning because it was already very late in the evening.

When Underwood woke up, he and CW began to argue, and they moved downstairs to the living room so as to not wake up CW's sister (Sister), who was visiting at the time. CW had a box of her belongings on the couch that Underwood threw out the door onto the front lawn. Underwood then told CW to take off the sweatpants that she was wearing because they belonged to him, which CW did and was left wearing only a t-shirt.

CW testified that at some point she found herself on the ground, but she stated she could not recall how she got there. Underwood grabbed her ankles and began pulling her toward the door, CW stated, and CW called Sister for help. Underwood let go of CW before Sister came downstairs. Sister testified that, when she came upon the scene, CW was standing and appeared to be frightened and crying.[6]

After putting on a pair of Sister's sweatpants, CW went to pick up her belongings from the lawn. As she was packing her belongings, CW felt several objects hit her head. Underwood was throwing a number of full Gatorade bottles and a pair of her high heels at her from the front door.[7]

---

[6] In a statement that Sister gave to the police the day of the incident, she said that Underwood was trying to push CW out the front door. During trial, Sister stated that she saw them moving "back and forth" and that it appeared that CW was trying to leave, and that Underwood was trying to make her stay. Sister did not testify at trial that she witnessed aggressive physical contact between Underwood and CW.

[7] CW stated that, over the course of the morning, she suffered abrasions and bruising to her right leg, scrapings on her left leg, bruising

Sister assisted picking up CW's items from the lawn, and they left to go to the house of CW's friend. While at the friend's home, CW and Underwood had a text message conversation. CW asked if she and Sister could come back to the house and get CW's uniform and credentials that she needed for work the next day, and Underwood agreed.

CW and Sister returned to the house and started collecting their things. When they had finished gathering some of CW's belongings into a box, Sister took the box and walked out the front door while CW went into the laundry room to look for more of her things. When Sister stepped outside the apartment, she heard the front door slam shut behind her. She found that the door was locked, and when CW did not come out within a few minutes, Sister began pounding on the front door and ringing the doorbell.[8] Sister yelled to open the door and threatened to call the police. Eventually CW came running out of the house looking scared.

CW stated that, while Sister was locked outside the apartment, Underwood came to the door of the laundry room

___

around her knee and elbow, and soreness on the back of her head. The injuries to her legs and elbow were documented in police photographs taken that day. CW testified that she sustained no injuries to her back or buttocks.

[8] CW explained at trial that if the button on the front door knob is engaged, the door automatically locks when it is closed and will not open from the outside of the home.

carrying a pillow that he then dropped to reveal he was holding a gun. CW testified that she could not remember what then happened prior to her running out the door of the apartment except that she had walked down the hallway, sat on the couch, and begun to cry. She agreed, however, that she had written in her statement to police on the day of the incident that Underwood had threatened her with the gun and refused to let her leave. According to Sister, when CW ran out of the apartment, CW told her that Underwood had a gun and was going to kill her and insisted they had to leave immediately. Sister testified that during the car ride, CW was crying and panicking and again said that Underwood had threatened her with a gun.

After the incident, CW moved to Maui. She and Underwood had periodic contact in June 2014 in an attempt to work things out in their relationship. In October 2014, they began to have contact again, and on multiple occasions between October and February or March, CW flew to O'ahu to see Underwood. During this time, CW and Underwood spoke about Underwood's case and her testifying in court, although CW stated that she did not remember what was said. CW testified she was no longer in a relationship with Underwood but she still loved him and wanted what was best for him.

During cross-examination, Underwood's counsel asked CW about whether she had kicked Underwood during the incident.

Q. [Defense Counsel] Why do you care if he's having
relationships with other women?
A. [CW] Because I'm in a relationship with him. I'm living
with him, and we've talked about it before. He said he
wasn't having any relationships.
Q. And that angered you?
A. I was upset about it. I was hurt.
Q. You went downstairs, right?
A. Yes.
Q. And you began talking to Mr. Underwood, right?
A. I don't remember what was said.
Q. But you – my question was you began talking to Mr.
Underwood, correct?
A. Yes.
Q. And there was a conversation going on, right?
A. Yes.
Q. And you became angry at him, right?
A. I wasn't angry with him.
Q. Then at some point, you came up to him and got in his
face, correct?
A. No.
Q. And then at some point you kicked him?
A. No.
Q. Correct? You attempted to kick him, correct?
A. No.
Q. At some point you fell on the ground, correct?
A. I was on the ground. I'm not sure how I got there.
Q. Well, he didn't push you down, right?
A. I don't remember how I got to the ground.
Q. Well, if he had pushed you down, you would certainly
remember it, right?
A. I'm not sure.
Q. In any event, you go to the ground somehow?
A. That's correct.

In closing argument, the State contended that the case was essentially about Underwood's need to "control" CW. The State noted that CW had said she and Underwood had spoken about the case, and the State argued that CW was "intimidated" into hiding the truth as a consequence of those conversations. The State then asserted that Underwood's counsel tried to get CW to fabricate her testimony:

[Prosecutor]: Now, [CW], on Monday, was honest about the fact that the defendant had dragged her through the house and caused those bruises because she knows that there's these pictures. She can't hide that. She can't deny the injuries. The defense attorney tried to get [CW] to make

7

> up some story about how she tried to kick the defendant and she fell back.
>
> [Defense counsel]: Objection.  Mischaracterizes the evidence.
>
> THE COURT: Overruled.

(Emphasis added.)  The prosecutor made further statements about defense counsel:

> [Prosecutor]: She doesn't want to admit [what the defendant did to her] because she told you she got back together with the defendant.  They talked about this case, so she took the middle ground.  She tried to say, "I don't remember." She never denied it, not once.  And the defense attorney tried to push [CW] on cross-examination; tried to get her to say or admit that she tried to kick the defendant.  And you saw her demeanor on the stand when that happened.  She got a little insulted.  She was a little upset.  He pushed her too far, and she slipped out of that protective mode.

(Emphasis added.)  The State concluded by urging the jury to "[e]nd [Underwood's] manipulation" by finding him guilty as charged.

The jury found Underwood guilty of the lesser included offense of unlawful imprisonment in the second degree in count I, not guilty in count II of carrying or use of firearm in the commission of a separate felony, and guilty of abuse of family or household members in count III.

Underwood filed a motion for new trial, arguing at the hearing that the prosecutor had improperly sought to bolster the State's witnesses by asserting to the jury that the "defense attorney tried to get [CW] to make up some story about -- she

tried to kick the defendant, and she fell back."[9]  The court denied the motion for new trial.

The circuit court sentenced Underwood to one year of probation in count I and two years of probation in count III, the terms to run concurrently, including seven days of incarceration as a special condition of probation.  The court entered its Judgment of Conviction and Probation Sentence (Judgment) on May 27, 2015.  Underwood timely appealed from the Judgment to the Intermediate Court of Appeals (ICA).

## II. ICA PROCEEDINGS

Before the ICA, Underwood contended that the prosecuting attorney committed misconduct during closing argument when the prosecutor accused defense counsel of soliciting CW to fabricate testimony and thereby violated Underwood's constitutional right to a fair trial.[10]  Underwood stated that in determining prosecutorial misconduct, the court

---

[9]     The defense counsel stated the following to the court regarding the prosecutor's accusation that he had "tried to get [CW] to make up some story."

> Your Honor, I never tried to get [CW] to make up any story. I never had any conversations with [CW] that would allow me to do that.  And there was no evidence presented to the jury that should be in any way tainting my credibility and therefore the defendant's credibility as well.  That ties in directly with the prosecution's argument that Mr. Underwood was attempting to manipulate and control [CW].

[10]    Underwood also challenged the sufficiency of evidence to support the convictions, but the issue is not raised to this court and thus is not addressed.

considers the following factors (1) the nature of the conduct; (2) the promptness of the curative instruction; and (3) the strength or weakness of the evidence against the defendant.

As to the nature of the conduct, Underwood asserted that the prosecutor's remark impermissibly attacked defense counsel's integrity and operated to denigrate the legal profession as a whole. Underwood contended that the prosecutor committed misconduct by accusing his counsel of "being dishonest, unethical and trying to induce [CW] to mislead the jury and commit perjury."

With regard to the promptness or lack of a curative instruction, Underwood submitted that his counsel promptly objected to the improper statement. However, the circuit court overruled the objection, Underwood explained, and thereby gave the impression that the attack by the prosecutor was proper.

Finally, Underwood argued that the factor considering the strength or weakness of the evidence weighed in favor of prosecutorial misconduct. The evidence presented by the State was based predominantly on CW's testimony and credibility, which Underwood contended was inconsistent. Because the case against Underwood hinged on the credibility of CW, Underwood argued, the State's case was not strong enough to outweigh the inflammatory effect of the deputy prosecutor's comments.

10

Underwood therefore concluded that, under the three factors, the prosecutor's comments clearly constituted prosecutorial misconduct in violation of Underwood's right to a fair and impartial jury.  Further, Underwood asserted, the nature of the prosecutorial misconduct was sufficiently egregious to bar retrial under the double jeopardy clause of the Hawaiʻi Constitution.  (Citing State v. Rogan, 91 Hawaiʻi 405, 423, 984 P.2d 1231, 1249 (1999).)

In its answering brief, the State argued that the prosecutor's remarks were not improper.  The State contended that Underwood's counsel had realized that CW was minimizing, citing CW's admission that she wanted the "best thing" for Underwood and CW's repeated lack of detailed recollection of the incident while testifying..  Defense counsel proceeded to ask a series of leading questions to take advantage of the CW's minimization, the State argued, pressuring her to agree that she had attempted to kick Underwood.  The prosecutor's statements were therefore an accurate description of defense counsel's cross-examination, the State contended, and their "primary thrust" was simply to stress to the jury that CW stuck to her story.[11]  Because the State reasoned that the prosecutor's

---

[11]    Although the State quoted both statements and argued generally that neither were misconduct, the State only specifically discussed the statement "the defense attorney tried to push [CW] on cross-examination; tried to get her to say or admit that she tried to kick the defendant."

11

comments were not improper, it did not address whether the statements were prejudicial before concluding that the circuit court did not abuse its discretion in refusing to grant Underwood a new trial.

On October 10, 2017, the ICA issued a summary disposition order (SDO). The ICA found that it was not improper for the prosecutor to assert in closing argument that defense counsel had tried to push CW on cross-examination to say or admit that she tried to kick the defendant. The ICA considered the statements in light of CW's testimony that she had numerous contacts with Underwood since the incident, had spoken with Underwood about testifying, and had expressed that she still loved Underwood and wanted what was best for him. Given this context and the substance of defense counsel's cross-examination, the ICA concluded that the prosecutor's statement was a fair characterization of what had occurred.

The ICA expressed some concern over the prosecutor's comment that defense counsel "tried to get CW to make up some story about how she tried to kick the defendant and she fell back." That remark, the ICA reasoned, could be interpreted as an attack on the integrity of defense counsel and in that regard could not be condoned. But the comment was "brief and somewhat indirect," the ICA stated. Therefore, the ICA held, it was distinguishable "at least in degree" from similar disparaging

comments this court found improper in State v. Klinge. (Citing 92 Hawaiʻi 577, 593, 994 P.2d 509, 525 (2000).)

Further, the ICA stated, although the court overruled Underwood's counsel's objection, the court had instructed the jury that "[s]tatements or remarks made by counsel are not evidence. You should consider their arguments to you, but you are not bound by their recollections or interpretations of the evidence." The ICA concluded that, given that "the arguably offending comment was a one-time brief remark" and the circuit court delivered the above instruction to the jury, and considering the strength of the evidence against Underwood, there was no reasonable possibility that the prosecutor's comment contributed to Underwood's convictions. Accordingly, the ICA affirmed the Judgment.

## IV. STANDARD OF REVIEW

"Allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of whether there is a reasonable possibility that the error complained of might have contributed to the conviction." State v. Rogan, 91 Hawaiʻi 405, 412, 984 P.2d 1231, 1238 (1999) (quoting State v. Balisbisana, 83 Hawaiʻi 109, 114, 924 P.2d 1215, 1220 (1996)) (internal quotation marks and citations omitted)).

13

## V. DISCUSSION

Underwood contends that the prosecutor's comments during closing argument suggesting that defense counsel attempted to induce CW to fabricate her testimony constituted prosecutorial misconduct. The misconduct warrants vacating his convictions and barring retrial under principles of double jeopardy, Underwood asserts.

In evaluating whether alleged prosecutorial misconduct amounts to harmful error, this court considers "(1) the nature of the conduct; (2) the promptness of a curative instruction; and (3) the strength or weakness of the evidence against the defendant." State v. Rogan, 91 Hawaiʻi 405, 412, 984 P.2d 1231, 1238 (1999). Although this framework was formulated in the context of a defendant's motion for mistrial, we have since extended it to review all allegations of prosecutorial misconduct.[12] See, e.g., State v. Schnabel, 127 Hawaiʻi 432, 452, 279 P.3d 1237, 1257 (2012). Misconduct requires vacating a conviction when, in light of these factors, "there is a reasonable possibility that the error complained of might have contributed to the conviction." Rogan, 91 Hawaiʻi at 412, 984

---

[12] "The term 'prosecutorial misconduct' is a legal term of art that refers to any improper action committed by a prosecutor, however harmless or unintentional." State v. Maluia, 107 Hawaiʻi 20, 25, 108 P.3d 974, 979 (2005).

P.2d at 1238 (quoting State v. Balisbisana, 83 Hawai'i 109, 114, 924 P.2d 1215, 1220 (1996)).

## A.    The Nature of the Conduct

Under the first factor, this court considers the nature of the challenged conduct in relation to our criminal justice system generally and the special role of the prosecutor specifically.[13]  See Rogan, 91 Hawai'i at 412-15, 984 P.2d at 1238-41.  Underwood specifically challenges two statements made by the prosecution during closing argument.  He argues that, in telling the jury that, "The defense attorney tried to get [CW] to make up some story about how she tried to kick the defendant and she fell back," the prosecutor attacked defense counsel's integrity by intimating the lawyer had solicited CW to perjure herself.  The prosecutor then reinforced this perception, Underwood contends, by reiterating that "the defense attorney tried to push [CW] on cross-examination; tried to get her to say or admit that she tried to kick the defendant."  As we vacate Underwood's convictions based on the prosecutor's first statement, we do not discuss the second comment.

_____

[13]     There is some discrepancy in our precedents as to whether this first factor amounts to a determination of whether prosecutorial misconduct took place, see, e.g., Rogan, 91 Hawai'i at 412, 984 P.2d at 1238; State v. Pacheco, 96 Hawai'i 83, 95, 26 P.3d 572, 584 (2001), or is a separate assessment of the severity of the wrongdoing following the initial identification of misconduct, see, e.g., State v. Tuua, 125 Hawai'i 10, 16, 250 P.3d 273, 279 (2011).  Because the two evaluations consistently overlap, we address these issues together.

The ICA minimized the effect of the first statement by characterizing it as a "one-time brief remark." However, the prosecutor's statement cannot be viewed in isolation. The prosecutor's closing argument repeatedly emphasized that Underwood had exerted "control" over CW. The prosecutor noted that Underwood and CW had "talked about this case" and claimed that "[w]hat [CW] did on the stand was a product of those conversations." The prosecutor went as far as to claim that CW's "testimony here in court, all of that was a product of the defendant's control" and stated that the jury could "[e]nd his manipulation" by "[f]ind[ing] him guilty."[14]

In light of the prosecutor's suggestion that Underwood had acted to wrongfully influence CW's testimony, the remark that defense counsel "tried to get [CW] to make up some story" necessarily implicated Underwood in his counsel's asserted misconduct. The clear insinuation of the prosecutor's assertion was that Underwood and his defense counsel had together sought to induce CW to commit perjury--a fact for which there was no evidence in the record. This likely had the effect of

---

[14] During the post-conviction hearing on Underwood's motion for a new trial, defense counsel argued that this last statement amounted to an exhortation to the jury to decide the case on irrelevant and unsubstantiated grounds. In closing argument, "[t]he prosecutor should make only those arguments that are consistent with the trier's duty to decide the case on the evidence, and should not seek to divert the trier from that duty." ABA Standards for Criminal Justice: Prosecution Function, Standard 3-6.8(c) (4th ed. 2015).

encouraging the jury not only to discredit CW's testimony, but also to doubt defense counsel and Underwood's personal character.

The ICA acknowledged that the prosecutor's remark could be interpreted as such an "attack on the integrity of defense counsel and in that regard cannot be condoned." The ICA ultimately dismissed the statement, however, as only an "arguably offending comment."

This understates the gravity of the insinuation. Like all advocates, a prosecutor is permitted during closing argument "to draw reasonable inferences from the evidence[,] and wide latitude is allowed in discussing the evidence." Rogan, 91 Hawai'i at 412, 984 P.2d at 1238 (quoting State v. Quitog, 85 Hawai'i 128, 145, 938 P.2d 559, 576 (1997)). Inferences are not reasonable, however, when the evidence does not "bear[] a logical and proximate connection to the point the prosecutor wishes to prove." State v. Basham, 132 Hawai'i 97, 112, 319 P.3d 1105, 1120 (2014) (quoting U.S. v. Waldemer, 50 F.3d 1379, 1384 (7th Cir. 1995)). A prosecutor exceeds the acceptable scope of closing argument when a statement "cannot be justified as a fair comment on the evidence but instead is more akin to the presentation of wholly new evidence to the jury, which should only be admitted subject to cross-examination, to proper

17

instructions and to the rules of evidence." Id. (quoting United States v. Klebig, 600 F.3d 700, 718 (7th Cir. 2009)) (emphasis omitted). And prosecutors, like all attorneys appearing before a tribunal, are "bound to refrain from expressing their personal views as to a defendant's guilt or credibility of witnesses." State v. Marsh, 68 Haw. 659, 660, 728 P.2d 1301, 1302 (1986) (citing United States v. Young, 470 U.S. 1 (1985); American Bar Association (ABA) Prosecution Function Standard, Standard 3-5.8 (1980)).

As stated, there was no evidence in the record to support an inference that defense counsel had threatened, manipulated, or otherwise pressured CW to perjure herself. The prosecutor's suggestion that CW had changed aspects of her story as a result of defense counsel's wrongful influence was impermissible speculation--or at least an impermissible personal opinion as to CW's credibility. Such an inference was therefore unreasonable under our precedents and beyond the proper scope of closing argument for an advocate.

"A prosecutor," moreover, "has the responsibility of a minister of justice and not simply that of an advocate." Quitog, 85 Hawai'i at 136 n.19, 938 P.2d at 567 n.19 (quoting Cmt. 1, Hawai'i Rules of Professional Conduct (HRPC) Rule 3.8). A jury is likely to "give special weight to the prosecutor's arguments, not only because of the prestige associated with the

prosecutor's office, but also because of the fact-finding facilities presumably available to the office." State v. Klinge, 92 Hawai'i 577, 592, 994 P.2d 509, 524 (2000) (quoting ABA Prosecution Function Standard 3-5.8 (1993)). Thus, special concerns arise when a prosecutor wrongly impugns the personal integrity of opposing counsel.

First, "[a] prosecuting attorney's improper suggestions, insinuations, and especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." Marsh, 68 Haw. at 661, 728 P.2d at 1302 (quoting Berger v. United States, 295 U.S. 78, 88 (1935)). This is to say that a jury is apt to attach undue weight to a prosecutor's disparagement of defense counsel, undermining the defendant's right to a fair trial. A prosecutor's duties include "specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence"--and not upon the basis of the prosecutor's negative personal assessment of defense counsel. Quitog, 85 Hawai'i at 136 n.19, 938 P.2d 559, 567 n.19 (1997) (quoting Cmt. 1, HRPC Rule 3.8). A prosecutor's attack on defense counsel's integrity implicates the defendant's right to a fair trial because it is a "strik[e] at the appellant over the shoulders of his counsel in an attempt to prejudice the

jury against the appellant." Bell v. State, 614 S.W.2d 122, 123 (Tex. Crim. App. 1981).

Second, a prosecutor's attack on the personal character of defense counsel "operate[s] to denigrate the legal profession in general." State v. Klinge, 92 Hawai'i 577, 595, 994 P.2d 509, 527 (2000). Such comments not only "lack[] the professionalism and decorum required of attorneys who practice before the bar of the courts of Hawai'i," State v. Ganal, 81 Hawai'i 358, 377, 917 P.2d 370, 389 (1996), but they also "undermine the objective detachment that should separate a lawyer from the cause being argued." Basham, 132 Hawai'i at 115, 319 P.3d at 1123 (quoting Marsh, 68 Haw. at 660, 728 P.2d at 1302). "Vigorous and zealous advocacy is a necessary component of our judicial system," Young v. Allstate Ins. Co., 119 Hawai'i 403, 419, 198 P.3d 666, 682 (2008) (brackets omitted), and a defendant in a criminal case is entitled under the Hawai'i and U.S. Constitutions to a lawyer who will fervently defend his or her interests in court. State v. Tetu, 139 Hawai'i 207, 215, 386 P.3d 844, 852 (2016). Insinuations that a criminal attorney's zealous defense of a client amounts to unethical behavior strike at the foundation of our adversarial system and "should not be tolerated by either the trial judge or the bar." U.S. v. Linn, 31 F.3d 987, 993 (10th Cir. 1994). Such comments thus weigh

heavily in favor of a finding of misconduct that warrants vacating Underwood's convictions.

**B.   The Promptness or Lack of a Curative Instruction**

Under the second factor, a reviewing court considers the extent to which a trial court's instruction to the jury minimized or eliminated the prejudicial effect of misconduct. Rogan, 91 Hawai'i at 415, 984 P.2d at 1241.  When a court promptly addresses the impropriety, "a prosecutor's improper remarks are [generally] considered cured by the court's instructions to the jury, because it is presumed that the jury abided by the court's admonition to disregard the statement." Id. (quoting State v. McGriff, 76 Hawai'i 148, 160, 871 P.2d 782, 794 (1994)) (alteration in original).

Here, the ICA placed great weight on the fact that the circuit court had previously instructed the jury that "[s]tatements or remarks made by counsel are not evidence.  You should consider their arguments to you, but you are not bound by their recollections or interpretations of the evidence."  The instruction was an ineffective remedy to the improper remarks for three reasons.

First, the instruction did not address the problematic nature of the prosecutor's statements.  While this court has reasoned that "expressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony," Basham, 132 Hawai'i

21

at 115, 319 P.3d at 1123 (quoting Marsh, 68 Haw. at 660, 728 P.2d at 1302), the danger in this case is not solely that the jury could wrongly consider the prosecutor's statements as evidence in its own right. Cf. Klinge, 92 Hawai'i at 592, 994 at 524 (noting that a jury is likely to presume a prosecutor has access to special "fact-finding facilities"). The jury may also have believed that the prosecution's remarks were acceptable inferences from the evidence instead of unsupported speculation. Indeed, the court's instruction specifically directed the jury to "consider [counsel's] arguments to you," and characterized what would follow as counsel's "recollections or interpretations of the evidence." The prosecutor's improper statements should not have been considered by the jury whatsoever because they were not a valid or reasonable interpretation of the evidence admitted at trial. Additionally, the assertion by the prosecutor of improper collusion outside of the trial proceeding was not a subject matter of the general instruction.

Second, the instruction was general in nature and was delivered to the jury along with a large number of other standard instructions before closing arguments began. "[I]t is unlikely that the circuit court's general instructions that were delivered well [before] the inflammatory comments along with the other general jury instructions could have negated the prejudicial effect" of the specific statements by the

prosecutor. Rogan, 91 Hawai'i at 415, 984 P.2d at 1241; see also Basham, 132 Hawai'i at 111, 319 P.3d at 1119 ("Additionally, while the court properly instructed the jury on accomplice liability, that instruction did not cure the prosecutor's misstatements of the law, where no specific curative instruction relating to the misstatements was given."); State v. Espiritu, 117 Hawai'i 127, 143, 176 P.3d 885, 901 (2008) ("While the court here did properly instruct the jury . . . that instruction could not cure Respondent's misstatements of the law, where no specific curative instruction relating to the misstatements was given.").

Third, "not only was there no curative instruction given to address the inflammatory comments, but the circuit court overruled defense counsel's timely objection." Rogan, 91 Hawai'i at 415, 984 P.2d at 1241. "By overruling defense counsel's objection, the court, at least tacitly, placed its imprimatur upon the [prosecutor]'s improper remarks." Schnabel, 127 Hawai'i at 453, 279 P.3d at 1258 (quoting Pacheco, 96 Hawai'i at 96, 26 P.3d at 585) (brackets and footnotes omitted). This is to say that the circuit court's overruling of defense counsel's objection likely appeared to the jury as though the court had endorsed the prosecution's statements as proper argument. Basham, 132 Hawai'i at 110, 319 P.3d at 1118 (holding

that, because the trial court overruled defense counsel's objection to a misstatement of law, it accredited the definitions given by the prosecutor).

Thus, the circuit court's prior instruction was unlikely to cure the prejudice created by the prosecutor's improper remarks, and no other curative measure was taken. This factor therefore weighs strongly in favor of vacating Underwood's convictions.

### C. The Weight of Evidence Against Underwood

In considering the final factor, reviewing courts weigh the evidence supporting the defendant's conviction. See Rogan, 91 Hawai'i at 415–16, 984 P.2d at 1241–42. When evidence is "so overwhelming as to outweigh the inflammatory effect of the" improper comments, reviewing courts will regard the impropriety as ultimately harmless. Id. at 415, 984 P2.d at 1241. When it cannot be said beyond a reasonable doubt that the same result would have been reached absent the improper conduct, however, the defendant's conviction must be vacated. See id.; Pacheco, 96 Hawai'i at 97, 26 P.3d at 586.

The ICA concluded that there was no reasonable possibility that the prosecutor's comments might have contributed to Underwood's convictions. In concluding the misconduct was harmless, the ICA stated that the strength of the

24

evidence in this case sufficiently outweighed the effect of the prosecutor's remark, but it did not provide further explanation.

Here, Underwood was convicted of unlawful imprisonment in the second degree and abuse of family or household members. Although testimony from other witnesses and physical evidence indicated the surrounding circumstances were generally consistent with CW's account of events, only the statements of CW herself directly described the actual acts constituting the two offenses. Thus, Underwood's convictions were ultimately dependent on the jury's assessment of CW's credibility.[15]

When a conviction is largely dependent on a jury's determination as to the credibility of a complainant's testimony, we have held that the evidence of the offense is not so "overwhelming" that it renders the prosecutor's improper statements harmless beyond a reasonable doubt. Rogan, 91 Hawaiʻi at 415, 984 P.2d at 1241. The potential for prejudice is particularly evident where, as here, the improper comments specifically concerned the credibility of the testimony on which

_____

[15] In his application, Underwood argues that there is a significant basis to conclude the jury discredited CW's statements. CW was potentially biased and had a motive to be untruthful, Underwood argues, because on the night of the incident, CW was hurt and angry because she believed that Underwood had been carrying on relationships with two other women. CW's inconsistent statements and memory regarding the incident clearly led the jury to doubt some aspects of her testimony, Underwood reasons, as evidenced by Underwood's acquittal on the firearm charge and conviction for only a lesser included offense of the kidnapping charge. Under all of these circumstances, Underwood maintains, it can hardly be said that the State had an overwhelmingly strong case against him.

the case turned.  See Pacheco, 96 Hawai'i at 97, 26 P.3d at 586.

Thus, the third factor also weighs in favor of vacating

Underwood's convictions.

The nature of the prosecution's remarks during closing

argument, the lack of any effective curative instruction by the

court, and the relative weight of the evidence, considered

collectively, make clear that "there is a reasonable possibility

that the error complained of might have contributed to"

Underwood's convictions.  Rogan, 91 Hawai'i at 412, 984 P.2d at

1238 (1999).

### D.  Double Jeopardy

This court has held that, in limited "exceptional

circumstances," prosecutorial misconduct may be "so egregious"

that the double jeopardy protections of article I, section 10 of

the Hawai'i Constitution may bar retrial.  Rogan, 91 Hawai'i at

423 & n.11, 984 P.2d at 1249 & n.11.  Reviewing courts do not

consider the subjective intent of the prosecutor in determining

whether retrial is prohibited.  Id. at 423, 984 P.2d at 124.

Rather, the relevant inquiry is whether, "from an objective

standpoint," the misconduct was so egregious that it "clearly

denied a defendant his or her right to a fair trial."  Id.

Our decisions do not provide bright line rules for

determining when misconduct is sufficiently egregious to bar

retrial, but we have emphasized that it is "a much higher standard than that used to determine whether a defendant is entitled to a new trial." Id. at 423 n.11, 984 P.2d at 124 n.11. By way of example, we have held that retrial was barred by double jeopardy principles when a prosecutor made an overt appeal to racial prejudice in closing argument. Id. In contrast, a prosecutor's "flagrant defiance of [a] circuit court's in limine ruling and personal and vulgar denigration" of a defendant was held not to be so egregious as to implicate double jeopardy principles. Pacheco, 96 Hawai'i 83, 98, 26 P.3d 572, 587 (2001). Other examples of impropriety that have fallen short of the double jeopardy standard include a prosecutor's commentary on the consequences of a jury's verdict in other legal proceedings, Tuua, 125 Hawai'i at 14, 250 P.3d at 277, a prosecutor's argument that the jury should disregard the court's instructions and decide the case based on "gut feeling," Schnabel, 127 Hawai'i at 452, 279 P.3d at 1257, and a prosecutor's misstatement of the law governing a potential defense, Espiritu, 117 Hawai'i at 144, 176 P.3d at 902.

In light of these precedents, the improper remarks in this case were not so egregious as to clearly deny Underwood a fair trial, and the protections of double jeopardy are therefore not implicated.

27

## VI. CONCLUSION

Accordingly, we vacate the ICA's November 1, 2017 Judgment on Appeal and the circuit court Judgment, and we remand the case to the circuit court for further proceedings.

Jon N. Ikenaga
for petitioner

Brian R. Vincent
for respondent

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ Michael D. Wilson



28