Electronically Filed
Intermediate Court of Appeals
CAAP-20-0000574
03-MAR-2022
08:04 AM
Dkt. 89 MO

NO. CAAP-20-0000574

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

STATE OF HAWAI'I, Plaintiff-Appellee,
v.
WILLIAM F. PRESCOTT, Defendant-Appellant

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CRIMINAL NO. 1CPC-17-0001381)

**MEMORANDUM OPINION**
(By: Hiraoka, Presiding Judge, Wadsworth and Nakasone, JJ.)

Defendant-Appellant William F. **Prescott** appeals from the **"Judgment** of Conviction and Sentence" entered by the Circuit Court of the First Circuit on August 26, 2020.[1]  For the reasons explained below, we vacate the Judgment and remand for a new trial.

Prescott was indicted by a grand jury on September 28, 2017.  The indictment stated, in relevant part:

> On or about July 4, 2017, in the City and County of Honolulu, State of Hawai'i, WILLIAM F. PRESCOTT did knowingly engage in sexual penetration with [**CW**], who was less than fourteen years old, by inserting his penis into her mouth, thereby committing the offense of Sexual Assault in the First Degree, in violation of Section 707-730(1)(b) of the Hawaii Revised Statutes.[2]

---

[1]   The Honorable Fa'auuga To'oto'o presided.

[2]   Hawaii Revised Statutes (**HRS**) § 707-730 (2014) provides, in relevant part:

(continued...)

Prescott pleaded not guilty. He informed the State he intended to rely on the defense of alibi.

Prescott's jury trial began on February 10, 2020. During opening statement, his attorney told the jury "[Prescott] could not have done it because he wasn't there and he was . . . continuously with other people who can corroborate and verify that he was not in [CW's] house and could not have done this."

### STATE'S CASE

CW was 14 years old when she testified at trial. In 2017 she was 12 years old. She lived with her parents, two brothers **Gordon** and **D.J.**, a sister, Prescott, and **Daniel** (Prescott's older brother). Prescott was a friend of D.J. Prescott stayed downstairs with CW's brothers. On July 4, 2017, CW was to perform a dance with a church group at Keʻehi Lagoon, for Samoan Flag Day. Earlier that day, she practiced with other church members at Kam Field park, then went home with her father and sister to get ready for the performance. She went downstairs to shower. Her father and sister stayed upstairs. She was wearing a bra and panties, and was wrapped in a towel. She went into Gordon's room to look for a Q-tip. She did not find one, so she went into D.J.'s room to look. Prescott was in D.J.'s room. CW did not expect to see Prescott in D.J.'s room. He was wearing sweat pants. He was not wearing a shirt.

Prescott asked CW who was home.

CW replied, "me, my sister, and my dad."

Prescott closed the bedroom door. He asked CW for a massage. She sat at the edge of the bed. When she turned her head she saw Prescott's "penis sticking out of his pants." It

---

<sup>2</sup> (...continued)
**Sexual assault in the first degree.** (1) A person commits the offense of sexual assault in the first degree if:

. . . .

(b)  The person knowingly engages in sexual penetration with another person who is less than fourteen years old[.]

was pointing up. Prescott forced her head down "to like try to suck it." She told him to stop. He did not stop. She scooted backward to get away. He pulled her waist and laid her on the bed. He started climbing on her. He kissed her. He said, "make sure not to tell your brothers." Prescott forced his penis into her mouth. After a few seconds, there was a noise "and then he got off real quickly and [CW] ran straight to the bathroom." She rinsed her mouth because she "didn't want his penis germs to be in [her] mouth." She showered, then went upstairs to change her clothes. But before she went upstairs, Prescott said "make sure not to tell anybody." She did not tell her father or her sister what happened. She was afraid she would be spanked by her father. CW went with her father and sister to Keʻehi Lagoon. She did not tell her mother or her brothers what happened.

She eventually told Daniel what happened. She thought "the older brother would put him in check and tell him why he did that." That was when her cousin **Fili** found out. Fili went to CW's house. It was nighttime. They were outside the house. Prescott, Daniel, and her sister were also there. She felt scared. She told them what happened. Prescott denied it. She "felt kind of upset[] . . . '[c]ause he's lying." Daniel believed Prescott.

CW's friend convinced her to tell Bishop Lesa from her church what happened. She did. Bishop Lesa encouraged her to tell her parents. [CW] did not tell her parents because she "was afraid that [she] might get lickens, spankings."

Fili testified that she was at work when she received a call from Daniel, who said he needed to talk to her about Prescott and CW. After work, Fili went to CW's house. CW's parents were not home. Daniel suggested to Fili they get Prescott and CW face-to-face to say what happened. Prescott said that on July 4, 2017, he had come home from work with D.J. He was in Gordon's room, resting before going to Keʻehi Lagoon to perform for Samoan Flag Day. CW came downstairs. Prescott told CW she could not be downstairs because the rule in the house was

"the girls cannot go downstairs and the boys can't go upstairs." CW "was breaking down, she was crying, she was trying to explain her side." Fili was "shocked" and "was trying to see what really happened." The meeting ended when CW's parents came home.

Bishop Lesa testified that CW came to talk to him. She was nervous and crying. She told him what happened with Prescott. He advised her to tell her parents. A week later, he learned that CW had not told her parents. He told CW that he would have to call her parents in and share what happened.

CW's father testified that on Tuesday, July 4, 2017, he took [CW] and her sister to Kam Field park to practice the dance they were to perform that night. They went home to shower before the performance. His older daughter showered upstairs, and CW showered downstairs, while he got dressed. After 30 minutes they left for Ke'ehi Lagoon. Bishop Lesa later told him what happened between CW and Prescott. He was angry because he let Prescott stay in his house. His wife was angry with him for letting Prescott stay in their house.

CW's mother testified that on July 4, 2017, she and Gordon went to prepare the food booth at Ke'ehi Lagoon. Her husband and their daughters went to the park for dance practice. She thought D.J. had gone to work with Prescott. Her husband and daughters arrived at Ke'ehi Lagoon between 3:00 to 4:00 p.m. Later, D.J., Prescott, and Daniel came to the food booth to eat before their performance. One day, she came home and found CW, her other daughter, Fili, Daniel, D.J., and Prescott outside their garage. They stopped talking when she came home. CW looked like she had been crying. She asked CW why she was crying. CW said she had something in her eyes. Bishop Lesa later spoke with CW's mother and father, after church. CW's mother went home and told Daniel that she did not want him and Prescott living in her house. She then went to the police.

CW's sister testified that she learned from Fili what happened between CW and Prescott. She met with Fili, CW, Daniel, and Prescott outside their house. CW told them what Prescott

did.  Prescott denied it; "He said he was at work."  CW was crying.  CW's sister corroborated CW's and her father's testimony about practicing at Kam Field, going back to the house, getting ready for the performance, and going to Keʻehi Lagoon.

D.J. testified that he woke up a little after 7:00 a.m. on July 4, 2017.  Prescott was at his house.  D.J. drove Prescott and a friend named Alex to work at a job in Kāneʻohe.  They finished work around 1:30 or 2:00 p.m.  D.J. drove them back to D.J.'s house.  D.J. dropped Prescott off at his house at about 2:30 p.m.  D.J. and Alex went "[s]omewhere in Kalihi" to pick up uniforms for the dance performance that night.  They went back to the house at about 3:30 p.m., got Prescott, and drove to Keʻehi Lagoon.  They got to Keʻehi Lagoon at about 4:00 p.m.  They met up with Prescott's friend **Browny** and rehearsed.  There was a rugby tournament going on but D.J. testified that Prescott did not play.  D.J. first learned of CW's allegations about Prescott during the meeting Fili called outside his and CW's house.

The State rested its case.  Prescott moved for a judgment of acquittal.  The circuit court denied the motion.

### DEFENSE CASE

Prescott chose to testify.  He worked side demolition jobs with D.J.  When they worked, he would stay at D.J.'s house so D.J. would not have to drive to pick him up.  Prescott stayed at D.J.'s house the night of Sunday, July 2, 2017, because they worked on Monday, July 3.  They worked until noon, then went to Keʻehi Lagoon to practice the dance for Samoan Flag Day with Browny.  After practice, D.J. left and Prescott watched the rugby game with his girlfriend, **Lepa**.  After the rugby game he watched Lepa play volleyball.  After the volleyball game, he told Lepa he was going to mix (prepare and drink kava) with his friend **Finau**. He caught a ride with his friends **Tereena** and **Leilani**.  Finau was with them in the car.  They left Keʻehi Lagoon around 8:00 p.m. On the way to ʻEwa Beach, they picked up **Galo** in Red Hill.  They got to ʻEwa Beach at about 9:00 p.m.  They mixed there until 9:00

or 10:00 the next morning, July 4.  Prescott left in the car with Tereena, Leilani, Finau, and Galo.  They dropped Galo off, then went to Lepa's home in Kūhiō Park Terrace (**KPT**).  Finau (who also lived in KPT) went home.

Prescott testified that he slept at Lepa's place.  He planned to go to Keʻehi Lagoon to watch Lepa play volleyball and for his dance performance.  He had been awake the entire night, so he went to sleep between 10:00 and 11:00 a.m.  Lepa woke him at about 2:00 or 2:30 p.m.  Tereena and Leilani came to pick them up.  Finau was with them.  They went straight to Keʻehi  Lagoon.  They arrived around 3:00 p.m.  Browny asked him to play rugby because they needed players.  He played rugby, then practiced for the dance performance.  The performance lasted 30 minutes to an hour.  He then went to watch Lepa's volleyball game.  The volleyball game ended at about 8:00 p.m.  Daniel picked him and Lepa up around 9:00 or 10:00 p.m.  They went to Foodland, stopped at Lepa's house, then continued to celebrate Finau's birthday in the parking lot of KPT.  He slept at Lepa's house that night.  On July 5, he woke up and went to D.J. and CW's house.  D.J. worked that day, but Prescott did not work with D.J.

Prescott learned of CW's sexual abuse allegations some time later, when Daniel called him.  Daniel asked him to go to CW's house to meet with him.  When he got to the house Fili, Daniel, CW's sister, and CW were there.  D.J. arrived later.  Prescott was accused of sexually assaulting CW.  Prescott responded to CW, "saying why would you say this about me.  And telling her why would you do it, like say those kind stuffs."  Prescott further testified:

> A.    Because when she accused me of rape I then said that when she came into the room, I told her what are you doing down here that you need to leave.
>
> Q.    Okay.  When was it that this, she came into the room and you told her you need to leave, do you know when that happened?
>
> A.    Not too sure.
>
> Q.    Was it during the Flag Week?

> A. Not too sure.
>
> Q. But other than that had you had any kind of interactions really with [CW]?
>
> A. No.

Prescott said he wanted to talk to CW's parents, who would understand. CW then "said that I didn't do it." They shook hands then went into the house. At trial, Prescott denied having any kind of improper sexual contact with CW.

Browny testified that he had known Prescott for 8-10 years, and their mothers "are real good friends." Browny's rugby team played in a tournament during Samoan Flag day. There was a game on July 4, 2017. It started at 2:30 p.m. His team was short players so he asked Prescott to play with them. There was a uniform for Prescott because "the team brings the uniforms." Browny also danced with D.J. and Prescott later that evening. The rugby game ran late, so they did not have time to shower. "We had to run off, take off our clothes that we were using for the game, put on our costumes to perform and then head over to the stage to wait." After the performance, they changed out of their costumes, got something to eat, then watched Lepa play volleyball.

Lepa testified that Prescott is the father of her children, a 1 year old and a 10 month old. In July 2017 they had been together for a month or two. She played in the Samoan Flag Day volleyball tournament. On July 3, Prescott watched her game. After her game finished, she went home, and Prescott left with Tereena and Leilani. She next saw Prescott at 9:00 or 10:00 a.m. on July 4. He was in a car with Tereena, Leilani, and Finau. Prescott got out of the car and went into Lepa's house. He went to sleep. Lepa woke Prescott up when it was time to go to Keʻehi Lagoon for her volleyball tournament. They got a ride from Tereena and Leilani. They left at about 3:00 p.m. They got to Keʻehi Lagoon at almost 4:00 p.m. Prescott went to "his rugby." They played their games at the same time. She next saw Prescott at about 7:00 p.m. He was watching her volleyball game.

Finau testified that he was born on the 4th of July. On the evening of July 3, 2017, Tereena and Leilani took Finau to ʻEwa Beach to mix. Prescott and Galo were also with them. They mixed for 12 hours, to celebrate Finau's birthday. Other people were also present. Finau took a video with his phone at 3:17 a.m. on July 4. He testified that Prescott was shown in the video, and in a screenshot time-stamped July 4, 2017 at 3:19 a.m. The video and screenshot were admitted into evidence.

### VERDICT

The State's and Prescott's counsel gave closing arguments on February 13, 2020. The jury found Prescott guilty as charged the same day. On August 26, 2020, Prescott was sentenced as a youthful offender to eight years in prison, with credit for time served. This appeal followed.

### APPEAL

Prescott raises a single point of error: "The DPA [deputy prosecuting attorney] committed misconduct during his closing argument that deprived Prescott of his right to a fair trial."

Prescott did not object during the State's closing argument. "Normally, an issue not preserved at trial is deemed to be waived. But where plain errors were committed and substantial rights were affected thereby, the errors may be noticed although they were not brought to the attention of the trial court." State v. Fagaragan, 115 Hawaiʻi 364, 367-68, 167 P.3d 739, 742-43 (App. 2007) (cleaned up). We review for plain error because of Prescott's contention that his constitutional right to a fair trial was violated.

"Allegations of prosecutorial misconduct[3] are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of whether there is a reasonable possibility that the error complained of might have contributed to the conviction."  State v. Rogan, 91 Hawaiʻi 405, 412, 984 P.2d 1231, 1238 (1999) (cleaned up).  We make the determination by considering: (1) the nature of the conduct; (2) the promptness of a curative instruction; and (3) the strength or weakness of the evidence against the defendant.  Id.  "Misconduct of a prosecutor may provide grounds for a new trial if there is a reasonable possibility that the misconduct complained of might have contributed to the conviction."  Id. (citation omitted).

### 1.    Nature of Conduct

Prescott contends that the DPA, in closing argument: expressed his personal opinion about **Browny's** credibility; personally vouched for **CW's** credibility; and argued that **Prescott** had the bias, interest, and motive to testify falsely because he was the defendant.  We conclude the DPA's arguments about Browny's and CW's credibility were not improper, but the DPA's argument about Prescott's credibility violated State v. Basham, 132 Hawaiʻi 97, 115, 319 P.3d 1105, 1123 (2014).

"It is well-established under Hawaiʻi case law that prosecutors are bound to refrain from expressing their personal views as to a defendant's guilt or the credibility of witnesses." Basham, 132 Hawaiʻi at 115, 319 P.3d at 1123 (cleaned up). "Prosecutors may, however, cite to specific facts or evidence indicating the lack of trustworthiness of the witness or defendant when discussing a witness or defendant's testimony during summation."  State v. Salavea, 147 Hawaiʻi 564, 582, 465

---

3    "The term 'prosecutorial misconduct' is a legal term of art that refers to any improper action committed by a prosecutor, however harmless or unintentional."  State v. Underwood, 142 Hawaiʻi 317, 325 n.12, 418 P.3d 658, 666 n.12 (2018) (citation omitted) (underscoring omitted).

P.3d 1011, 1029 (2020) (citing <u>State v. Walsh</u>, 125 Hawaiʻi 271, 295, 260 P.3d 350, 374 (2011)) ("[T]he prosecution is free to refer to specific inconsistencies and contradictions in a defendant's testimony or with other evidence[.]").  "A statement about a witness's credibility that is made without reference to the evidence or facts supporting the assertion amounts to an expression of personal opinion." <u>Id.</u> (footnote omitted) (citing <u>Basham</u>, 132 Hawaiʻi at 118, 319 P.3d at 1126) (noting that prosecutor's argument that defendant had "no reason to tell you the truth" was improper because it was not based on the evidence or a reasonable inference drawn from the evidence).

Concerning Browny's credibility, the DPA argued (the portions challenged by Prescott's point of error are shown in bold italics):

> Defense witnesses, Browny.  Browny came here and said that, you know what, I was with the defendant from 8:30 in the morning all the way to night on the 3rd.  You know that's false because the defendant already said he went to work with the -- with D.J.  ***Browny is already credibility shot.***  He wants you to believe that he was just with him. He doesn't know, he was just out with him the whole time.
>
> The only time he wasn't with him is on the 4th when he came there and he needed all these players, remember that? He was short.  This is July 4th, think about this.  He has his own league.  July 4th when everybody is off, the most important day that they're playing rugby and he can't find people to show up.  He's got 20 to 30 dancers couple of hours before and he can't find enough players that he needs the defendant to play for him.
>
> These players are in a league.  Browny wants you to believe that he brings the uniforms, all these uniforms to grown people, grown men playing rugby.  They can do their own uniform.  They can wash their own uniform.  But Browny wants you to believe that he's the den mother taking care of all this, bringing the uniforms for the dance, bringing the uniforms for the rugby.  Think about it, it doesn't make any sense.
>
> And luckily he had cleats for the defendant too, right, that day that fit him playing rugby.  ***Hogwash.***  He wasn't playing rugby.  That's what Browny wants you to think.
>
> And Browny, what did he say, oh, I only known him like nine years.  But after a while, oh, 15 years.  Our parents are good friends.  Known him.  I only know D.J. and [CW's family] since May, that's two months before that.  Who's his allegiance too? [sic] Who's his bias for?  The defendant.

10

Think about this.

Prescott contends that the DPA's argument was similar to the argument at issue in Basham. In that case the deputy prosecuting attorney argued: "On behalf of the prosecution, I adamantly state to you, that [the State's witnesses] have been completely credible witnesses, that they are worthy of your belief." Basham, 132 Hawaiʻi at 115, 319 P.3d at 1123. That argument, the supreme court noted, was similar to those held improper by State v. Marsh, 68 Haw. 659, 660-61, 728 P.2d 1301, 1302 (1986) (prosecutor improperly expressed personal opinion by stating, "I feel it is very clear and I hope you are convinced, too, that the person who committed this crime was none other than [defendant]," and referring to defense witness's alibi testimony by stating, "I sincerely doubt if [witness] had seen [defendant] there.") and State v. Sanchez, 82 Hawaiʻi 517, 534, 923 P.2d 934, 951 (App. 1996) (prosecutor improperly asserted "personal evaluation of the credibility of certain witnesses in final argument" by using personal pronoun "I."). Basham, 132 Hawaiʻi at 115, 319 P.3d at 1123.

The DPA's argument about Browny was not like the ones at issue in Basham, Marsh, or Sanchez. Browny's testimony presented a potential alibi for Prescott — that Prescott was at Keʻehi Lagoon playing rugby at the time he allegedly sexually assaulted CW. The DPA challenged Browny's credibility by establishing the length of time he had been friends with Prescott; that their mothers were friends; and questioning Prescott's ability to fill in on Browny's rugby team without having a uniform or cleats. The DPA did not express a personal opinion about Browny's credibility. Nor was the DPA's use of the colloquial "hogwash" improper under the circumstances. See State v. Clark, 83 Hawaiʻi 289, 304-05, 926 P.2d 194, 209-10 (1996) (where prosecutor described defendant's testimony as "a cockamamie story[,]" supreme court stated "the use of [a] slang term, if supported by evidence, is not improper argument.").

Of CW's credibility, the DPA argued (the portions challenged by Prescott's point of error are shown in bold italics):

> ***Who is that witness that the State's asking you to believe? [CW]. It's [CW].*** She came here and testified. You be the judges whether she's lying, mistaken, or telling the truth. That 12-year-old girl, is she smart enough to make up something like that? ***Is [CW] believable? The answer is yes.***
>
> What did [CW] tell you? [CW] tells you that all she remembers is on the 4th it was a very important day, she had to perform. She went to go practice with her dad and her sister. They came home. [CW] tells you that she went upstairs to get her clothes and because her dad and her sister were taking the only other bathroom she had to go downstairs.
>
> She left her clothes upstairs. She was wrapped in a towel and she went downstairs. She said she needed Q-tips so she went to [Gordon]'s room because usually [he] has the Q-tips. No Q-tips. So she went to [D.J.]'s room then that's where the defendant was. She opens the door -- the defendant opens the door and she goes inside looking for the Q-tip.
>
> What does she tell you the defendant asked her? Who's home. She tells him, oh, my dad and sister are upstairs taking a shower right now. You're not suppose [sic] to be down here, that's what he says. But she says that's not what happened. What he said was, I want you to massage something. So he closes the door and she sits on the bed and what does he do? Grabs her head, exposes his penis and forces her head down to his penis trying to make her suck his penis. She says she's fighting him off, that her neck hurt so badly, but she does.
>
> Then what does he do? He grabs her and pulls her onto the bed. And she's scooting back on the bed. And that's how she gets to the middle of the bed. And what does he do as he's trying to kiss her now at this time? Don't tell your brothers. And then he kisses her, straddles her. Gets on top of her. And now he's there with his hand taking his penis and trying to stick it into her mouth. And she's fighting him off, telling him no, and stop. She tells you that. She said she trying [sic] to cover her hand but he removes her hand away.
>
> Then she tells you, she shows you on the stand how he pinches her mouth open so he can stick his penis into her mouth. She explains that to you. She shows that to you. Is that girl devious enough to make up something like that? You be the judges of that. If she's trying to make up this story. She doesn't have to. She can just say he tried to touch me. She could make up a story, you know, so easily and so believable why do all that? Why complicate things? Why say my dad didn't hear. Why say, you know, I couldn't yell because he was covering my mouth. She said she just didn't yell. She didn't think anybody would hear. Why make

her own case more difficult? ***Because she's credible. Everybody knows she's credible.***

So then what happens? He hears a noise. She says she believes it's the neighbors but he hears a noise and he takes his penis out of her mouth and gets off. And what does she do? She runs to the bathroom. What's the first thing this girl -- 12-year-old does is wash her mouth out. Why? Because she doesn't want his penis germs in her mouth, that's what she tells you. And then she takes a shower. And then she goes to perform. Doesn't say nothing to dad. Doesn't say nothing to her sister. Why? Don't tell nobody.

That's what happened, ladies and gentlemen. Why make her case difficult? Why? Why make it up? She's not mad at the defendant. Nobody -- defendant says that I don't have my problems with her. She has no reason to make this up. She has no animosity against the defendant. She's not mad at the brother. Not trying to get back at the brother. She has no reason to make this up. No reason to just bring this up out of the blue.

What does she have to gain from this? What does she gain from this really? Two-and-a-half years later she's still dealing with this. What does she gain from it? Having to confront the brother. Having to talk to the Bishop. Having to explain to her parents. What did she lose? Her brother lost a good friend. She broke up that relationship, right? That was her intent, a 12-year-old?

. . . .

***Is [CW] believable? The answer is yes. [CW], 12-years-old. Is she believable? The answer is yes.*** Why? Because she was sexually assaulted by the defendant on July 4th, 2017 when the defendant stuck his penis into her mouth, into her [sic] mouth of a 12-year-old. Thank you.

The DPA's argument concerning CW's credibility was not improper. The DPA did not express a personal belief in CW's testimony. Rather, the DPA summarized CW's testimony and argued that: a 12-year-old could not make up such a detailed story; CW bore no grudge against Prescott or Daniel; and the consequences to CW — having to tell her story to her cousin, brother, sister, and Daniel (when the group met outside CW's house), having to tell Bishop Lesa, having to tell her parents, having her brother lose a good friend — made it unlikely that CW was not telling the truth. On this record, the argument was not improper.

About Prescott, the DPA argued (the portions challenged by Prescott's point of error are shown in bold italics):

> When the defendant testifies, ladies and gentlemen, his credibility is to be tested in the same manner as any other witness. This is in your instructions. And understand that he doesn't get points because he testified. He does not get points because he testified. Once he goes up there and he says I didn't do this. I didn't do this, this, this, this, this. You can now base your credibility as any other witness. Those credibility factors work for him too. Does he have an interest, motive, or bias in this? Absolutely. He's on trial. What is he going to say? He has to say I was with somebody. I was with Finau. I was with Browny. I was with Lepa. ***I didn't do this. I couldn't have done this. He has to say that.***

The Hawai‘i Supreme Court has held:

> A suggestion that defendants have no reason to tell the truth impinges upon fundamental principles of our system of justice, including the presumption of innocence, the burden of proof upon the government, the right to testify without penalty, and the right to a fair trial with an unbiased jury.
>
> . . . .
>
> Generic arguments by the prosecutor that defendants, by virtue of being defendants, have no reason to tell the truth or have the greatest incentive to lie also transform a defendant's decision to testify at trial into an automatic burden on credibility. Although the prosecution is allowed wide latitude when making closing remarks, a prosecutor's comments may <u>not</u> infringe on a defendant's constitutional rights. Generic arguments that a defendant is not a credible witness because of the defendant's status, like generic accusations of tailoring,[4] discourage a defendant from exercising [their] constitutional right to testify on [their] own behalf.

<u>Basham</u>, 132 Hawai‘i at 116-18, 319 P.3d at 1124-26 (cleaned up); see also <u>Salavea</u>, 147 Hawai‘i at 585, 465 P.3d at 1032 (reaffirming that "it is improper for prosecutors to make generic arguments regarding a defendant's credibility during summation") (cleaned up). Here, the DPA's rhetorical question and answer ("Does he have an interest, motive, or bias in this? Absolutely.

---

[4] "A generic tailoring argument occurs when a prosecutor states that the defendant was able to sit through the trial and hear the testimony of other witnesses, thereby allowing the defendant the opportunity to shape [their] testimony to fit that of other witnesses, even when there is no evidence that defendant has actually done so." <u>Basham</u>, 132 Hawai‘i at 116, 319 P.3d at 1124 (cleaned up). "[I]t is improper, under article I, section 14 of the Hawai‘i Constitution, for the prosecution to make generic accusations during closing argument that a defendant tailored [their] testimony based solely on the defendant's exercise of [their] constitutional right to be present during the trial." <u>Id.</u> (cleaned up).

He's on trial.") and assertion that Prescott "has to say" he "didn't do this. [He] couldn't have done this" was misconduct because it was "uncoupled from evidence showing the defendant has a particular interest in the outcome separate from the generic interest shared by all defendants in criminal cases." Salavea, 147 Hawaiʻi at 585 n.29, 465 P.3d at 1032 n.29. This factor weighs in favor of Prescott.

### 2.    Curative Instruction

No curative instruction was given because Prescott did not object to the State's generic credibility argument.[5] This factor also weighs in favor of Prescott. State v. Wakisaka, 102 Hawaiʻi 504, 516, 78 P.3d 317, 329 (2003).

### 3.    Strength of Evidence

The third factor requires that we "weigh the evidence supporting the defendant's conviction." State v. Williams, 149 Hawaiʻi 381, 396, 491 P.3d 592, 607 (2021) (citing Underwood, 142 Hawaiʻi at 328, 418 P.3d at 669). "When evidence is so overwhelming as to outweigh the inflammatory effect of the improper comments, reviewing courts will regard the impropriety as ultimately harmless." Id. (citing Underwood, 142 Hawaiʻi at 328, 418 P.3d at 669). However, "when it cannot be said beyond a reasonable doubt that the same result would have been reached absent the improper conduct[,] the defendant's conviction must be

---

[5]    Although Prescott did not object to the DPA's closing argument, his counsel responded during Prescott's own closing:

> Really, the two arguments that the State keeps coming back to them [sic] are bias, interest, and motive. And they also say, you know, [Prescott], his testimony, well, he's biased. Well, any innocent person who takes the stand has an interest and motive in telling a story that backs him up. So I mean saying that he's biased, of course, he's a defendant. Yes, he has an interest in the outcome of this case. There's nothing I can do about that.

vacated."  Id. (citing Underwood, 142 Hawaiʻi at 328, 418 P.3d at 669) (cleaned up).

In Underwood, the defendant was convicted of unlawful imprisonment in the second degree and abuse of a family or household member.  On appeal, Underwood argued that the deputy prosecuting attorney's closing argument — that defense counsel attempted to induce the complaining witness to fabricate her testimony — was prosecutorial misconduct.  The supreme court noted that testimony from other witnesses and physical evidence indicated the circumstances were generally consistent with the complaining witness's account of events.  However, the complaining witness was the only person who described the actual acts constituting the offenses.  142 Hawaiʻi at 328-29, 418 P.3d at 669-70.  Under those circumstances, the supreme court noted:

> When a conviction is largely dependent on a jury's determination as to the credibility of a complainant's testimony, we have held that the evidence of the offense is not so "overwhelming" that it renders the prosecutor's improper statements harmless beyond a reasonable doubt.  The potential for prejudice is particularly evident where, as here, the improper comments specifically concerned the credibility of the testimony on which the case turned.

Id. at 329, 418 P.3d at 670 (citations omitted).  The supreme court vacated Underwood's conviction.

In Williams, the defendant was convicted of sexual assault.  On appeal, Williams argued three instances of misconduct by the deputy prosecuting attorney.  149 Hawaiʻi at 393, 491 P.3d at 604.  The complaining witness was the only witness "who could describe the actual acts constituting the offenses."  Id. at 397, 491 P.3d at 608.  Under those circumstances, the supreme court held that "[t]he evidence against Williams was not so overwhelming that it rendered the prosecutor's misconduct . . . harmless."  Id.  The supreme court vacated Williams' conviction.

In this case, the State called a number of witnesses — CW's sister, D.J., and Fili — to challenge Prescott's defense ("he could not have done it because he wasn't there.").  Each of

those witnesses had a potential bias in favor of their relative, CW. See State v. Tuua, 125 Hawai'i 10, 17, 250 P.3d 273, 280 (2011) ("Because this was a case involving the credibility of witnesses, each of whom arguably had a potential interest or bias, it weighs against holding that the improper statement was harmless.").

Moreover, even if Prescott **was** at CW's house on the afternoon of July 4, 2017, his being there is not an element of sexual assault in the first degree. The criminal act is "sexual penetration[.]" HRS § 707-730(1)(b). CW was the only witness who testified about the alleged act constituting Prescott's offense. Under those circumstances, we cannot say that the evidence against Prescott was so "overwhelming" that it rendered the prosecutorial misconduct harmless beyond a reasonable doubt. Underwood, 142 Hawai'i at 329, 418 P.3d at 670; Williams, 149 Hawai'i at 397, 491 P.3d at 608. This factor weighs in favor of Prescott.

### CONCLUSION

Based on the foregoing, all three Rogan factors weigh in favor of Prescott, and the prosecutorial misconduct was not harmless beyond a reasonable doubt. Accordingly, we vacate the Judgment entered by the circuit court on August 26, 2020, and remand to the circuit court for a new trial.

DATED: Honolulu, Hawai'i, March 3, 2022.

On the briefs:

Randall K. Hironaka,
for Defendant-Appellant.

Donn Fudo,
Deputy Prosecuting Attorney,
City and County of Honolulu,
for Plaintiff-Appellee.

/s/ Keith K. Hiraoka
Presiding Judge

/s/ Clyde J. Wadsworth
Associate Judge

/s/ Karen T. Nakasone
Associate Judge

17