*** FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER ***

Electronically Filed
Supreme Court
SCWC-16-0000630
30-JUN-2021
09:09 AM
Dkt. 79 OP

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

_____

STATE OF HAWAI'I,
Respondent/Plaintiff-Appellee,

vs.

MATTHEW K. WILLIAMS,
Petitioner/Defendant-Appellant.

_____

SCWC-16-0000630

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-16-0000630; 1PC141000589)

JUNE 30, 2021

RECKTENWALD, C.J., NAKAYAMA, McKENNA, AND WILSON, JJ.
AND CIRCUIT JUDGE CHANG, FOR POLLACK, J., RECUSED

OPINION OF THE COURT BY WILSON, J.

Petitioner/Defendant-Appellant Matthew Williams

("Williams") was convicted of four counts of sexual assault

following a jury trial.  At trial, the prosecutor introduced to

the jury incriminating statements, allegedly made by Williams,

without previously disclosing them to the defense during

discovery as required by Hawai'i Rules of Penal Procedure ("HRPP") Rule 16(b)(1) (2016).[1]  The prosecutor also introduced statements, incriminating to the defendant, allegedly made by the complaining witness despite the court's motion in limine ruling barring their introduction.  Finally, the prosecutor engaged in improper, unnecessarily lurid questioning of defense witnesses to inflame the passions of the jury.  The cumulative impact of the prosecutor's misconduct deprived Williams of a fair trial and was, therefore, not harmless beyond a reasonable doubt.

---

[1]     HRPP Rule 16(b)(1) provides, in relevant part:

(b) Disclosure by the Prosecution.

     (1) Disclosure of Matters Within Prosecution's Possession. The prosecutor shall disclose to the defendant or the defendant's attorney the following material and information within the prosecutor's possession or control:

          . . . .

          (ii) any written or recorded statements and the substance of any oral statements made by the defendant, or made by a co-defendant if intended to be used in a joint trial, together with the names and last known addresses of persons who witnessed the making of such statements;

          (iii) any reports or statements of experts, which were made in connection with the particular case or which the prosecutor intends to introduce, or which are material to the preparation of the defense and are specifically designated in writing by defense counsel, including results of physical or mental examinations and of scientific tests, experiments, or comparisons[.]

## I.    BACKGROUND

### A.    Indictment and Pretrial Proceedings

Williams was indicted on April 9, 2014, on one count of sexual assault against a minor in the first degree, in violation of Hawai'i Revised Statutes ("HRS") § 707-730(1)(c) (2014),[2] and three counts of sexual assault against a minor in

---

[2]    HRS § 707-730(1) provides, in relevant part:

(1)  A person commits the offense of sexual assault in the first degree if:

. . . .

(c)  The person knowingly engages in sexual penetration with a person who is at least fourteen years old but less than sixteen years old; provided that:

(i)  The person is not less than five years older than the minor; and

(ii)  The person is not legally married to the minor[.]

HRS § 702-206(2) (2014) provides, in relevant part:

(a)  A person acts knowingly with respect to his conduct when he is aware that his conduct is of that nature.

(b)  A person acts knowingly with respect to attendant circumstances when he is aware that such circumstances exist.

HRS § 707-700 (2014) (modified 2016), then extant, provided in relevant part:

"Sexual penetration" means:

(1)  Vaginal intercourse, anal intercourse, fellatio, deviate sexual intercourse, or any intrusion of any part of a person's body or of any object into the genital or anal opening of another person's body; it occurs upon any penetration, however slight, but emission is not required.  As used in this

(continued . . .)

the third degree, in violation of HRS § 707-732(1)(c) (2014) in the Circuit Court of the First Circuit ("circuit court").[3] Prior to trial, the government notified the defense in writing of its intention to call Alexander J. Bivens, Ph.D. ("Dr. Bivens") as an "expert witness on the dynamics of sexual abuse to the incident for which [Williams was] charged." By letter dated October 20, 2014, the defense requested, pursuant to HRPP Rule

---

(continued . . .)
definition, "genital opening" includes the anterior surface of the vulva or labia majora; or

(2) Cunnilingus or anilingus, whether or not the actual penetration has occurred.

For purposes of this chapter, each act of sexual penetration shall constitute a separate offense.

[3] HRS § 707-732(1), provides in relevant part:

(1) A person commits the offense of sexual assault in the third degree if:

. . . .

(c) The person knowingly engages in sexual contact with a person who is at least fourteen years old but less than sixteen years old or causes the minor to have sexual contact with the person; provided that:

(i) The person is not less than five years older than the minor; and

(ii) The person is not legally married to the minor[.]

HRS § 707-700 (2014) (modified 2016), then extant, provides in relevant part:

"Sexual contact" means any touching, other than acts of "sexual penetration", of the sexual or other intimate parts of another, or of the sexual or other intimate parts of the actor by another, whether directly or through the clothing or other material intended to cover the sexual or other intimate parts.

4

16(b)(1)(iii),[4] that the prosecutor provide the defense with a report containing Dr. Bivens' conclusions and opinions, notes and/or records of what he had reviewed and done in this case, and pleadings and orders in other cases in which Dr. Bivens had testified or served as an expert witness. In response, the prosecutor provided the defense with over 500 pages of articles consisting of the studies and literature Dr. Bivens would be relying upon for his expert testimony. The defense filed a motion to compel discovery or, in the alternative, to exclude testimony of Dr. Bivens, on the basis that the prosecutor failed to provide the defense with a written report from Dr. Bivens in accordance with Rule 16(b)(1).[5]

Williams filed two motions in limine on January 20, 2016 to exclude the testimony of Dr. Bivens and to exclude testimony from the complaining witness, T.Y., consisting of out-of-court statements that Williams sexually assaulted him.

---

[4]     Although defense counsel did not cite HRPP Rule 16(b)(1)(iii) in his October 20, 2014 letter, defense counsel's Opening Brief suggests that he was requesting an expert report pursuant to HRPP Rule 16.

[5]     While it is true that the prosecutor did not provide the defense with a report of Dr. Bivens' anticipated expert testimony, there is no evidence that such a report existed to disclose in the first place. Therefore, it is not clear that the State violated HRPP Rule 16(b)(1)(iii). We note that the Federal Rules of Criminal Procedure Rule 16(a)(1)(G), unlike HRPP Rule 16(b)(1)(iii), provides:  "At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial." The Hawai'i Penal Rules Committee should consider whether a similar amendment would be appropriate to address situations like the one in this case.

The circuit court held a hearing on Williams' motions in limine on April 11, 2016.[6]  The court denied the defense's motion as to Dr. Bivens' testimony, but granted the motion as to the alleged out-of-court statements T.Y. made to S.S. and C.O., T.Y.'s friends from school.  The court stated that T.Y.'s alleged statements would be excluded and "[u]nless the government can come up with a hearsay exception, we litigate the matter outside the presence of the jury" and the court would "generally" not allow the statements.  In seeking clarification, the prosecutor asked the court, "[w]ith respect to the actual statements made, will the court permit these witnesses to testify to any changes in behavior that these witnesses observed in their friend?"  The trial judge responded, "I think that they can testify to what is relevant in terms of what they saw and -- what they saw and heard, not meaning statements."

The prosecution filed its witness list and amended witness list, which did not identify the subject matter to which the prosecution's witnesses would be testifying; at no time prior to trial did the prosecutor disclose to the defense Williams' out-of-court oral statements to T.Y.'s father ("C.Y.").

Williams identified eleven witnesses in his filed witness list that included himself, his wife, his two children,

---

[6]     The Honorable Karen S.S. Ahn presided.

six non-family character witnesses to testify as to Williams' "nonviolent and non-aggressive character, honesty and integrity" and "the absence of any indications of sexual deviancy or behaviors that are consistent with the allegations against him," and one non-family witness to testify as to her observations of T.Y.  Of the eleven witnesses listed by the defense in its witness list, in addition to the defendant, the court permitted six witnesses to testify.  Of those six witnesses, three were the defendant's family members and three were non-family members, including two non-family character witnesses.  The four excluded witnesses were all male non-family character witnesses.

## B.    Trial Proceedings

### 1.    Opening Statements

Several times during her opening statement, the prosecutor referenced out-of-court communications T.Y. allegedly had with his friends.  The defense initially objected on the grounds of hearsay and that the statements were precluded by the defense's motion in limine:

> [DEFENSE]:  Judge, these are the alleged statements to two of his friends which you said is [sic] not coming in.
>
> [PROSECUTOR]:  I'm not going into the contents of the statement, your Honor.  I'm just going to say that he talked to two of his friends.  That's it.
>
> THE COURT:  Okay.
>
> [DEFENSE]:  Well, talked about what?  I mean, it's irrelevant if he talked to his friends.  And tell them what?  It's basically suggesting something that she can't go into and we can't go into.

7

[PROSECUTOR]:  I'm not bringing in -- even with the witnesses, when they testify on the stand, they're very aware that they're not to go into what [T.Y.] told them, the exact statement.  I'm just going to say that he disclosed to two friends.

[DEFENSE]:  Disclosed what?

[PROSECUTOR]:  What this man did to him.

[DEFENSE]:  Judge, that's absolutely forbidden.

THE COURT:  How are you going to say it, he talked to two friends?

[PROSECUTOR]:  That he told two close friends what this man did to him.

THE COURT:  Okay.  Hearsay involves actual statements.

. . . .

THE COURT:  But their argument is that it comes very close to suggesting to the jury that he told them exactly what happened.  I think you can -- <u>I think you can put forth, if you're going to bring it out, that he talked to two friends</u> --

[PROSECUTOR]:  Okay.  About the incident.

THE COURT:  -- but that's about it.

[DEFENSE]:  <u>Judge, I object.  It still creates an inference that he talked to them about this event, and we can't examine him without opening the door.</u>  And she should not be allowed to.  Talked to them about what?

THE COURT:  Your objection is preserved.  Let's move on.

Several minutes later, the prosecutor again referenced out-of-court communications T.Y. allegedly had with his friend, S.S., via a disappearing message on a computer application:

> One of [T.Y.'s] friends will tell you about how she and [T.Y.] sat in [T.Y.'s] room the night she learned about what happened.  She will tell you how [T.Y.] could not look at her, how [T.Y.] could not say what happened.  He could only write it, and write it he did.  Using his computer, he sent her a message.

The defense objected, this time alleging that the prosecutor had not previously disclosed the statements to the

defense during discovery, as required by HRPP Rule 16(b)(1).[7]
During a bench conference, the prosecutor stated, "we don't have
[the message] either.  It's one of those messages that
disappears.  It's like through social media but I guess it just
disappears after you log off, so we don't have it either.  I
don't know the contents of the message."[8]  The court sustained
the objection in the presence of the jury and instructed,
"Ladies and gentlemen, the last assertion by the State about an
alleged computer message is stricken from the record.  You will
disregard it."

The defense denied that any sexual contact occurred
between T.Y. and Williams.  The defense contended that the
charges were based on fabrications T.Y. made up in retaliation
against Williams' minor daughter, J.W., for rejecting his

---

[7]     The record reflects the following exchange during a bench
conference:

> [DEFENSE]:  Judge, we're hearing about this message for the
> first time.  It's never been disclosed to us.
>
> THE COURT:  The computer message?
>
> [DEFENSE]:  Yes.  Never been disclosed.

[8]     Given that the prosecution did not have a written or recorded
copy of the computer message, it is not clear that the State violated HRPP
Rule 16(b)(1)(i), which requires disclosure of "the names . . . of persons
whom the prosecutor intends to call as witnesses in the presentation of the
evidence in chief, together with any relevant written or recorded
statements[.]"  (Emphasis added.)

Regardless, the court sustained the defense's objection on the
grounds of nondisclosure, stating, "Okay. If it wasn't -- if the fact that a
computer message was created was not divulged, I think it's fair for the
defense to object. I'm going to sustain that objection. I'll strike that last
statement referring to the computer message." (emphasis added).

romantic interest in her.  The defense stated that J.W., who was two years older than T.Y., "had moved on" and that T.Y.'s and J.W.'s friendship had ended.  According to the defense, because there was no physical evidence or other witnesses, the case boiled down to credibility:  whether the jury believed Williams or T.Y.

**2.  Dr. Bivens' Expert Witness Testimony**

The State's expert witness, Dr. Bivens, is a licensed clinical psychologist with a private practice on Kaua'i.  Before testifying, Dr. Bivens was informed that T.Y. was male and in his early teenage years, but attested that "[o]ther than that . . . I don't know anything else about anything that's been alleged or anything about this particular case."  Dr. Bivens testified that victims of sexual abuse who are under the age of sixteen typically do not disclose the abuse "for a very long time," a concept known as "delayed reporting."  Dr. Bivens explained that many of these victims do not want to disclose abuse due to "embarrassment and shame," "fear of harming the people around them" such as upsetting their parents or getting the abuser in trouble, fear of being blamed, or fear of losing the relationship with the abuser.  Dr. Bivens testified that male children in particular may delay reporting out of "concern that they might be accused of being gay or be teased for being

gay[,]" and often have "the most difficult time disclosing [sexual abuse]."

### 3.    Previously Barred and Undisclosed Testimony

At trial, T.Y. testified that Williams sexually abused him on two occasions:  the first incident occurring on or about March 9, 2012 to and including March 26, 2012; and the second incident occurring on or about May 1, 2012 to and including June 11, 2012.  T.Y. testified that he told two friends, C.O. and S.S., about the two incidents of abuse.

During S.S.'s testimony, the prosecutor asked S.S. to describe the "sudden change in [T.Y.]'s relationship with [J.W.]"  S.S. responded that she asked T.Y. why he and J.W. were not "hanging out anymore" when they "used to be together all the time."  The defense objected on hearsay grounds.  During a bench conference, the prosecutor claimed that S.S.'s testimony bore on T.Y.'s credibility.  The prosecutor argued:

> [PROSECUTOR]:  Right.  And so [T.Y.] -- [T.Y.] wasn't able to verbalize what happened to him, so instead he just typed it on the computer.  And these instant messages, we don't have them because it disappeared, but I can have [S.S.] explain the nature of the program that they were using at the time that -- so I've never seen these messages.  No one has them, the disclosure, so I'm not going to go into specifically what [S.S.] wrote but that she did -- this is the way in which she learned about what happened to him, which also goes to explain the changes that she observed in [T.Y.].

Although the court had previously sustained--during the prosecutor's opening statement--the defense's objection to the prosecutor's reference to the computer messages, stricken

the reference from the record, and instructed the jury to disregard the reference, the court now allowed S.S. to respond to the prosecutor's question about why T.Y. was no longer friends with J.W., without describing what T.Y. said in the messages:

> [PROSECUTOR]:  But [S.S.] can explain the computer, the program that they were using to communicate.  I won't have her go into specifically what she read but just that this was the method in which she learned about what happened to [T.Y.].
>
> THE COURT:  All right.
>
> [DEFENSE]:  I think what you previously said is the limit to which they can go.  We had no idea about any of this.  It was never disclosed to use.  If the prosecutor knew about it, she had a duty to tell us.  It certainly does get into contents, and I think that they were obligated to produce them.
>
> THE COURT:  Well, the objection -- I think what the defense is saying, they continue to object.  So I'll let you ask her, I asked him about it, and he didn't answer me and he typed something.  That's it.  Okay?

The prosecutor asked S.S., "Without telling us exactly what he wrote, if you can describe at that time [T.Y.]'s emotional state when you first asked him this question."  S.S. then told the jury:

> I specifically remember him having this sort of distant stare and just recalling it, and immediately when he started thinking about it, he turned around, and he didn't want me to see it.  But he didn't want to tell me at first, so I kept pestering him.
>
> And eventually he told me to go on this messenger app called Recall.  It doesn't work anymore because they closed down the program, but basically he had to type to me through this messenger app when I'm standing right behind him and receiving the messages through my own computer because he couldn't physically talk to me about it.  And he would tell me the story through that, and I could just feel the atmosphere around us.  It was so heavy and dark, and he

12

didn't say a word for at least ten minutes after he wrote everything out.

The prosecutor then asked, "After that night when you and [T.Y.] were both sitting at your computers, did you have an idea of who was involved and what had happened to [T.Y.]?" S.S. responded:

> Yes.  Well, he specifically told me what happened, so I was just -- I couldn't really take in all the information because it just didn't seem like it happened.  Like, I couldn't believe it, but I -- I know that he wasn't lying, obviously.  He would tell me the truth.  And it was just bizarre that he wouldn't like talk to [J.W.], and that made a lot of sense after that.

(Emphases added.)

The prosecutor also elicited previously undisclosed testimony from C.Y., T.Y.'s father, about Williams.  When asked by the prosecutor about his interactions with the Williams family, C.Y. recalled a "kind of an odd incident" during which Williams kept asking C.Y. about T.Y.:

> [Williams] insisted on me going down to their house in Laie to look at a roofing problem because I'm a roofing contractor.  And I said, "I'll meet you down there."  And he goes, "No, no, I'm going to ride with you."  And this is from Kaneohe.  And I said, "Well, I have other estimates to do down in Kahuku.  Why don't you just meet me down there."  And he goes, "No, I need to ride with you."  I said, "All right."  And in 40 years of roofing, I've never taken a potential customer on that kind of a jaunt.  So we got down to the house, and all the way down all he could talk about was [T.Y.].

(Emphasis added.)

The defense objected, and argued that the prosecution had violated HRPP Rule 16(b)(1)(ii) by failing to disclose the substance of Williams' oral statements prior to trial:

13

[DEFENSE]: Judge, if there are any statements of my client that are being attributed to him now, it's certainly the first time we're hearing about them. We made a request for discovery of any statements which were made by my client. We have no idea what these statements are.

The prosecutor argued that she did not know specifically what Williams said to C.Y. beyond generally talking about T.Y. The court rejected the prosecutor's justification and noted that Williams' statement to C.Y. was encompassed by HRPP Rule 16(b)(1)(ii)'s language requiring disclosure of "any written or recorded statements and the substance of any oral statements made by the defendant." Citing HRPP Rule 16, the court ultimately sustained the objection as to anything Williams said during the car ride with C.Y.:

> [PROSECUTOR]: Judge, I don't have any statements either other than [C.Y.] is just telling us about the last incident that he had with Mr. Williams and going for a ride and him talking about [T.Y.]. I don't know specifically anything that pertains to this case other than that he wanted to talk about [T.Y.].
>
> [DEFENSE]: Then it's irrelevant.
>
> THE COURT: Well, I don't know. It's an admission, but Rule 16 does require that --
>
> [PROSECUTOR]: If it's any written or recorded statements, your Honor.
>
> THE COURT: -- and the substance of any oral statements made by the defendant together with the names and last known addresses. So if there's an objection, under Rule 16 I'm going to have to --
>
> [PROSECUTOR]: He has an opportunity to cross-examine the witness, your Honor.
>
> THE COURT: Well, we're talking about a Rule 16 problem, and if there's an objection, I don't think I have much choice but to at this point bar it.
>
> [PROSECUTOR]: Even if it's not exculpatory, your Honor, the State didn't violate --

14

> THE COURT: The current Supreme Court is going to come down very hard on these. We just got a murder conviction overturned on a very complicated murder for one statement that the prosecutor asked about. That was it. Actually, that was the ICA, but it's because they are being very strict.
>      So I'm going to -- there's been an objection, so you can't go into these statements unless you've disclosed at least the substance of them.
>
> [PROSECUTOR]: <u>So I can't go into the statement, but I can go into the car ride without whatever he had to talk about?</u>
>
> THE COURT: <u>Yeah.</u>
>
> [PROSECUTOR]: Okay.

(Emphases added.)

Despite the court's ruling sustaining the defense's objection to C.Y.'s testimony about his conversation with Williams, the prosecutor continued questioning C.Y. about the conversation, the defense objected two more times, and the court sustained both objections. However, the court did not instruct the jury to disregard the answers given by Williams, or otherwise provide the jury with a curative instruction.

### 4. Cross-examination of Defense Witnesses

The defense called three female non-family character witnesses to the stand: two--Malia Ka'ai-Barrett and Laura Morgan--to testify as to Williams' "nonviolent and non-aggressive character, honesty and integrity" and "the absence of any indications of sexual deviancy or behaviors that are consistent with the allegations against him;" and one--Autumn Butler--to testify as to T.Y.'s relationship with J.W. and

T.Y.'s motive to fabricate his allegations against Williams. During cross-examination of Ka'ai-Barrett, Butler, and Morgan, the prosecutor asked all three witnesses their opinion about Williams' alleged conduct: "sucking a child's penis is not something you would expect to see in public; right?"  The defense objected in only one instance, and the court sustained the objection as being beyond the scope of direct examination.

### 5.   Jury Instructions

At the close of all evidence, the circuit court instructed the jury that "[t]rial procedures are governed by rules.  When a lawyer believes that the rules require it, it is his or her duty to raise an objection.  It is my responsibility to rule on such objections.  You must not consider objections made by lawyers in your deliberations."  The circuit court also instructed the jury that it "must disregard entirely any matter which the Court has ordered stricken."

### 6.   Closing Arguments

During her closing argument, the prosecutor accused the defense witnesses, who were mostly family members, of collaborating to create false testimony.  The prosecutor claimed that the defense witnesses had two years to collaborate and figure out what they were going to say in court.

16

**7.    Motion for Judgement of Acquittal or New Trial**

The jury found Williams guilty on all counts. Williams moved for a judgment of acquittal or a new trial on the basis of prosecutorial misconduct and insufficiency of the evidence. The circuit court[9] denied Williams' motion. On September 14, 2016, the circuit court sentenced Williams to a mandatory twenty-year term of incarceration and denied Williams' motion for bail pending appeal.

**C.    Appellate Proceedings**

**1.    ICA Appeal**

Williams appealed his conviction to the ICA, contending that: the prosecutor committed misconduct before and during trial that violated Williams' constitutional right to a fair trial; the circuit court erred by permitting testimony of out-of-court statements; the circuit court erred by permitting Dr. Bivens to testify; the circuit court erred by denying Williams' Motion for Judgment of Acquittal and Motion for a New Trial on the grounds of insufficient evidence of the dates of the offenses; and the circuit court erred by limiting the number of character witnesses permitted to testify in Williams' defense. The ICA affirmed Williams' conviction, holding that the only instance of prosecutorial misconduct occurred when the

---

[9]    The Honorable Glenn J. Kim presided at the hearing on the Motion for Judgement of Acquittal or New Trial and at sentencing.

prosecutor failed to disclose Williams' alleged statements to C.Y. to the defense prior to trial. State v. Williams, 146 Hawai'i 116, 117, 456 P.3d 189, 190 (App. 2020). However, the ICA held the misconduct to be harmless error. Id.

### 2. Certiorari Application

Williams filed an application for writ of certiorari with this court on May 1, 2020. In his application, Williams alleged that the ICA erred by concluding that the prosecutor's misconduct did not deprive him of a fair trial. Williams contended the ICA also erred by affirming circuit court rulings that: permitted improper and previously undisclosed evidence-- including out-of-court statements made by the complaining witness and the substance of out-of-court statements made by Williams--to be presented at trial; limited the number and type of witnesses who could testify on Williams' behalf; and concluded there was sufficient evidence upon which to sustain Williams' conviction. Williams' application for writ of certiorari was granted.

## II. STANDARDS OF REVIEW

### A. Motion for A New Trial

> The granting or denial of a motion for new trial is within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion. It is well-established that an abuse of discretion occurs if the trial court has clearly exceeded the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant.

18

State v. Austin, 143 Hawai'i 18, 29, 422 P.3d 18, 29 (2018) (internal quotation marks, brackets, and citations omitted).

"As a general matter, the granting or denial of a motion for new trial is within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion." State v. Kim, 103 Hawai'i 285, 290, 81 P.3d 1200, 1205 (2003). "The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." Id. (citing State v. Furutani, 76 Hawai'i 172, 178–79, 873 P.2d 51, 57–58 (1994)).

**B. Admissibility of Evidence**

> Different standards of review must be applied to trial court decisions regarding the admissibility of evidence depending on the requirements of the particular rule of evidence at issue. When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard. However, the traditional abuse of discretion standard should be applied in the case of those rules of evidence that require a "judgment call" on the part of the trial court.

Kealoha v. Cty. of Haw., 74 Haw. 308, 319-20, 844 P.2d 670, 676 (1993).

**C. Prosecutorial Misconduct**

"Allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of whether there is a reasonable possibility that the error

19

complained of might have contributed to the conviction." State v. Pacheco, 96 Hawaiʻi 83, 93, 26 P.3d 572, 582 (2001) (internal quotation marks and citation omitted).

If there is a reasonable possibility that the prosecutorial misconduct might have contributed to the conviction, the misconduct is not harmless beyond a reasonable doubt and the defendant is entitled to a new trial. Pacheco, 96 Hawaiʻi at 93, 26 P.3d at 582. "In order to determine whether the alleged prosecutorial misconduct reached the level of reversible error, the appellate court considers the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against defendant." State v. Conroy, 148 Hawaiʻi 194, 201, 468 P.3d 208, 215 (2020) (internal brackets omitted) (quoting State v. Agrabante, 73 Haw. 179, 198, 830 P.2d 492, 502 (1992)).

D.    **Sufficiency of Evidence**

In reviewing a challenge to the sufficiency of the evidence, "[e]vidence adduced in the trial court must be considered in the strongest light for the prosecution[.]" State v. Kalaola, 124 Hawaiʻi 43, 49, 237 P.3d 1109, 1115 (2010) (quoting State v. Richie, 88 Hawaiʻi 19, 33, 960 P.2d 1227, 1241 (1998)). "The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact." Id.

## III.   DISCUSSION

### A.   Prosecutorial Misconduct Was Not Harmless Beyond a Reasonable Doubt.

The constitutions of the United States and the State of Hawai'i guarantee every individual accused of a crime the fundamental right to a fair trial.  See U.S. Const. amend. VI; Haw. Const. art. I, § 14.  "Prosecutorial misconduct may provide grounds for a new trial if the prosecutor's actions denied the defendant a fair trial."  State v. Pasene, 144 Hawai'i 339, 364, 439 P.3d 864, 889 (2019) (quoting Agrabante, 73 Haw. at 198, 830 P.2d at 502).  In reviewing whether prosecutorial misconduct deprived the defendant of a fair trial, we consider three factors:  "(1) the nature of the conduct; (2) the promptness of a curative instruction; and (3) the strength or weakness of the evidence against the defendant."  Pasene, 144 Hawai'i at 364, 439 P.3d at 889.  "Misconduct requires vacating a conviction when, in light of these factors, 'there is a reasonable possibility that the error complained of might have contributed to the conviction.'"  State v. Underwood, 142 Hawai'i 317, 325, 418 P.3d 658, 666 (2018) (emphasis added) (quoting State v. Rogan, 91 Hawai'i 405, 412, 984 P.2d 1231, 1238 (1999)).  When no single error or prejudicial remark constitutes prosecutorial misconduct, "the cumulative weight of such errors may create an atmosphere of bias and prejudice which no remarks by the trial

21

court could eradicate." Pasene, 144 Hawai'i at 364, 439 P.3d at 889 (quoting State v. Kahalewai, 55 Haw. 127, 129, 516 P.2d 336, 338 (1973)).

In the present case, the cumulative effect of the prosecutor's misconduct deprived Williams of a fair trial. Applying the three factors to determine whether the violation of Williams' right to a fair trial is harmless, we conclude that it was not. See, e.g., State v. Conroy, 148 Hawai'i 194, 204, 468 P.3d 208, 218 (2020).

### 1. Nature of the conduct

Under the first factor--the nature of the prosecutor's misconduct--"we consider 'the nature of the challenged conduct in relation to our criminal justice system generally and the special role of the prosecutor specifically.'" Pasene, 144 Hawai'i at 365, 439 P.3d at 890 (quoting Underwood, 142 Hawai'i at 325, 418 P.3d at 666). In this case, the nature of the misconduct committed by the prosecutor included her: (1) failure to disclose out-of-court statements made by the defendant; (2) introduction at trial of out-of-court statements made by the complaining witness that had been barred pretrial by the defense's motion in limine; and (3) improper and lurid questioning of witnesses at trial.[10]

---

[10] We also note that the prosecutor, during her closing argument, accused defense witnesses of collaborating to create false testimony.

(continued . . .)

### a. The prosecutor's failure to disclose statements made by Williams violated HRPP Rule 16(b)(1) and constituted prosecutorial misconduct.

HRPP Rule 16(b)(1)(ii) requires disclosure of "any written or recorded statements and the substance of any oral statements made by the defendant" prior to trial. We have recognized the importance of the pretrial disclosure process, stating, "An essential component of the basic tools is the process of discovery, which promotes fairness in our adversary system." State v. Pitts, 146 Hawai'i 120, 136, 456 P.3d 484, 500 (2019) (internal quotation marks and citation omitted).

In the present case, at trial, C.Y., the complaining witness' father, testified about an out-of-court conversation he had with Williams during a long car ride where "all [Williams] could talk about was [T.Y.]" This constituted a violation of HRPP 16(b)(1)(ii), which requires disclosure of "the substance of any oral statements made by the defendant" prior to trial. Despite the court sustaining the defense's continued objections, the prosecutor continued questioning C.Y. about the conversation. As the defense argued in its opening statement, this case hinged on whether the jury believed T.Y. or Williams. Williams' interactions with T.Y. and the nature of their relationship were critical to Williams' claim that no sexual

---

(continued . . .)
Because this issue is not necessary to the resolution of this case, we decline to consider whether it constitutes harmless error.

contact occurred.[11]  Evidence that Williams had a fixation on or an inappropriate level of interest in T.Y. might have prompted the jury to believe that Williams harbored inappropriate feelings toward T.Y. that he later acted upon, by committing the offenses alleged by T.Y.  Thus, the prosecutor's violation of HRPP Rule 16(b)(1)(ii) and questioning of C.Y. that elicited testimony about previously undisclosed statements by Williams constituted misconduct.

   **b.**  **The prosecutor's introduction of out-of-court statements that had previously been barred by the defense's motion in limine constituted prosecutorial misconduct.**

    This court has expressed concerns about prosecutorial misconduct in cases where the defendant's credibility is particularly important.  In Underwood, this court stated that "[t]he potential for prejudice is particularly evident where . . . the improper comments specifically concerned the credibility of the testimony on which the case turned."  142 Hawaiʻi at 329, 418 P.3d at 670; see also Conroy, 148 Hawaiʻi at 204, 468 P.3d at 218 ("Prosecutorial misconduct affecting the issue of defendant's intent was not harmless beyond a reasonable

---

   [11]  Seven of the ten witnesses on Williams' witness list (not including Williams) were identified to testify about their "personal observations of and interactions with [T.Y.]," T.Y.'s relationships with various members of the Williams' family, and T.Y.'s "motive to fabricate his allegations" against Williams.

doubt where the only witness to the altercation were the defendant and the [complaining witness].").

Here, the prosecutor introduced out-of-court statements made by T.Y. via computer message that had been barred pretrial.[12]  Evidence of T.Y.'s messages explaining to S.S. the alleged abuse was material to Williams' guilt and/or punishment.  T.Y.'s messages to S.S. allegedly revealed abuse and thus greatly undermined Williams' credibility and corroborated the credibility of the only other witness who could testify as to whether the acts did or did not occur: T.Y.  The effect of its introduction may have imparted to the jury that because T.Y. told S.S. about the alleged abuse, he was credible.  Thus, the prosecutor's introduction of out-of-court statements that were barred by the court's motion in limine ruling constituted misconduct.

---

[12]  As discussed above, see supra note 7 and accompanying text, when the prosecutor first referenced the computer messages in her opening statement, the defense objected on the grounds that the messages had not been previously disclosed.  The court sustained the objection, citing the prosecution's failure to disclose the messages to the defense, though it is not clear that the prosecution's nondisclosure of the computer messages violated HRPP Rule 16(b)(1)(i).  See supra note 8.  However, the court later permitted the prosecutor to question S.S. about the computer messages during direct examination, over the defense's objections.

Regardless, the defense's lack of knowledge about the computer messages did not preclude the messages from being covered by the scope of the pretrial motion in limine: the content of the computer messages clearly fell within those statements covered by the motion, which sought to bar all out-of-court statements made by T.Y. alleging that Williams sexually assaulted him.  In granting the defense's motion, the court stated that T.Y.'s alleged statements would be excluded, that "[u]nless the government can come up with a hearsay exception, we litigate the matter outside the presence of the jury," and that the court would "generally" not allow the statements.  Thus, the prosecutor's introduction of the evidence of the computer messages constituted a violation of the motion in limine.

###### c. The prosecutor's lurid and inflammatory cross-examination of defense witnesses constituted prosecutorial misconduct.

"We have recognized that prosecutors 'should not use arguments calculated to inflame the passions or prejudices of the jury[,]' as '[a]rguments that rely on . . . prejudices of the jurors introduce into the trial elements of irrelevance and irrationality that cannot be tolerated.'" Pasene, 144 Hawai'i at 370, 439 P.3d at 895 (alterations in original) (quoting Rogan, 91 Hawai'i at 413, 984 P.2d at 1239). Even when the statements are not calculated to inflame the passions or prejudices of the jury, when the likely result is that the jury will be inflamed, the statements are prejudicial. Id. (holding that the prosecutor's reference to Charles Manson "may lead the jury to react based on emotion, rather than in an objective way, and threatens to introduce an atmosphere of bias and prejudice as the jury enters deliberation" (internal quotation marks and citation omitted)).

Here, the prosecutor's questioning of defense witnesses--asking whether sucking a child's penis was something they expected to see in public--was improper. The prosecutor's questioning emphasized the lurid nature of the accusations and was likely to elicit an emotional response from the jury. The questions were rhetorical and called for immaterial information. Because the prosecutor's questioning of defense witnesses was

26

calculated to inflame the passions or prejudices of the jury it
constituted misconduct.

## 2. The promptness or lack of a curative instruction

With regard to the second factor--the promptness of
the court's curative instructions--we consider:

> [T]he extent to which a trial court's instruction to the
> jury minimized or eliminated the prejudicial effect of
> misconduct.  When a court promptly addresses the
> impropriety, a prosecutor's improper remarks are generally
> considered cured by the court's instructions to the jury,
> because it is presumed that the jury abided by the court's
> admonition to disregard the statement.

Pasene, 144 Hawai'i at 365, 439 P.3d at 890 (internal citations,
quotation marks, and brackets omitted) (quoting Underwood, 142
Hawai'i at 327, 418 P.3d at 668).

To determine whether the circuit court's instructions
to the jury cured the risk of prejudice to the defendant, we
evaluate "whether the cumulative effect of prejudicial conduct
going to the issue of guilt is so strong that it overcomes the
presumption that the curative remarks of the court have rendered
the prejudicial remarks harmless."  State v. Pemberton, 71 Haw.
466, 476, 796 P.2d 80, 85 (1990).  The Pemberton court held that
although a prosecutor's improper statements and questioning of a
witness are typically cured by instructions to the jury to
disregard them in reaching a verdict, sometimes the improper
conduct can create an atmosphere of bias and prejudice that "no
remarks by the trial court could erase."  Id. (internal

27

quotation marks and citation omitted).  The Pemberton court held that the cumulative effect of the prejudicial conduct in that case was so pervasive that it overcame the presumption that limiting instructions by the circuit court could render the prejudicial remarks harmless.  Id.  ("[T]he fact that defense counsel was repeatedly forced to object and the court repeatedly forced to sustain those objections and to issue cautionary instructions is likely to have had the reverse effect of focusing the jury's attention on that evidence and the fact that it was being suppressed.").

Similarly, in State v. Underwood, where the prosecutor told the jury that "defense counsel tried to get the complaining witness to make up some story," we held that a jury instruction failed to cure the prejudicial effect of the prosecutor's statement because: (1) "the instruction did not address the problematic nature of the prosecutor's statements"; and (2) "the instruction was general in nature and was delivered to the jury along with a large number of other standard instructions before closing arguments began."  142 Hawai'i at 328, 418 P.3d at 669.

In the instant case, the circuit court's general limiting instruction delivered at the close of evidence failed to cure the prejudicial effect of the prosecutor's introduction of out-of-court statements not produced to the defense prior to trial.  See Pemberton, 71 Haw. at 475-76, 796 P.2d at 84-85.

28

The jury heard the prosecutor elicit testimony from C.Y. describing Williams' unusual interest in T.Y. Although defense counsel objected and the court advised the prosecutor during a bench conference that the objection would be sustained, the court did not sustain the objection in front of the jury. Thereafter, the prosecutor immediately returned to questioning C.Y. about the same subject in front of the jury. Defense counsel objected again and the court sustained the objection, but the court neither struck the testimony, nor gave a curative instruction to the jury.

Two days later, the circuit court provided the jury with a general instruction, stating,

> Trial procedures are governed by rules. When a lawyer believes that the rules require it, it is his or her duty to raise an objection. It is my responsibility to rule on such objections. You must not consider objections made by lawyers in your deliberations. . . . You must disregard entirely any matter which the court has ordered stricken.

As in Underwood, where a general instruction given much later amidst various other instructions was not curative, 142 Hawai'i at 328, 418 P.3d at 669, here also, the circuit court's general instruction was not curative. Also, because the instruction was not promptly given when the prejudice occurred, and was instead provided at the close of evidence with a barrage of other instructions, the jury would not have known the

29

evidence or objections to which the court was referring. Additionally, the prejudicial effect of C.Y.'s testimony and the prosecutor's continued questioning on subject matter the court had sustained an objection to may have imparted to the jury that T.Y.'s testimony was corroborated by C.Y., and, therefore, that T.Y. was more credible than Williams. Thus, we cannot conclude that the court's general instruction cured the risk of prejudice to Williams.

The circuit court's specific instructions to the jury regarding T.Y.'s computer messages to S.S. also failed to cure the prejudicial effect of the prosecutor's improper use of those statements. The circuit court had ruled at the pretrial hearing on the defense's motion in limine that the State could not introduce out-of-court statements made by T.Y. Yet, the prosecutor referred to T.Y.'s computer messages during her opening statement, even though the statements contained in those messages were barred by the defense's motion in limine.[13] The court struck from the record and instructed the jury to disregard the prosecutor's reference to the computer messages. But despite the court's ruling during the prosecutor's opening statement and the defense's continued objections, the prosecutor later introduced the same evidence of T.Y.'s computer messages during her direct examination of S.S.

---

[13] See supra note 12 and accompanying text.

30

Prejudice caused by a prosecutor's willful violation of a court's ruling on a motion in limine is not necessarily overcome by a later limiting instruction. Pacheco, 96 Hawai'i at 98, 26 P.3d at 587. In Pacheco, the defense filed a motion in limine that sought to exclude at trial any evidence of the defendant's prior convictions. Id. at 88, 26 P.3d at 577. Although the court granted the motion, the prosecutor referenced defendant's prior convictions during cross-examination and in closing arguments. Id. at 98, 26 P.3d at 587. We held that the prosecutor's "willful violation of the circuit court's in limine ruling constituted prosecutorial misconduct," and because the circuit court failed to give a curative instruction during cross-examination or closing arguments when the statements were made, the prejudicial effect could not be overcome. Id.

In Pacheco, the prejudice caused by the prosecutor's improper presentation of evidence in willful violation of the court's motion in limine ruling was not overcome because the court failed to provide a prompt curative instruction. Id. at 98, 26 P.3d at 587. We face a similar situation here. As in Pacheco, despite the court's pretrial motion in limine ruling, the prosecutor twice presented prejudicial evidence about T.Y.'s computer messages to the jury: first, when she referenced the messages in her opening statement, and again, when she questioned S.S. about the messages during direct examination.

Because the jury heard that T.Y. told S.S. about the alleged abuse from both the prosecutor and S.S., and the court's only curative instruction to the jury was that the message was "stricken" the first time it was introduced, after which it was again introduced and remained introduced as evidence, we cannot conclude that the prejudicial effect was overcome by a curative jury instruction. See Pasene, 144 Hawai'i at 371, 439 P.3d at 896 ("Attempts to refer to evidence that has been specifically excluded by the circuit court . . . undermine[s] the integrity of the criminal justice system.").

With T.Y.'s and Williams' credibility a central issue, the improper introduction of previously barred evidence of T.Y.'s computer messages might have left the jury with the impression that T.Y. was more credible than Williams. If the jury believed that T.Y. had previously told others about the alleged abuse, testimony on T.Y.'s computer messages corroborated and bolstered T.Y.'s testimony. And with Williams' relationship with T.Y. another important issue, the improper introduction of undisclosed statements by Williams evincing his interest in T.Y. might have led the jury to disbelieve his claim that no sexual contact occurred. Finally, there was no curative instruction delivered by the court to address the prosecutor's blatantly lewd question--"sucking a child's penis is not

32

something you would expect to see in public, would you?"--posed to three defense witnesses on cross-examination.

We therefore conclude that the circuit court's limiting instructions, and lack thereof, did not cure the prejudicial effect of the prosecutor's misconduct.

**3.    Strength or weakness of the evidence against Williams**

"In considering the final factor, reviewing courts weigh the evidence supporting the defendant's conviction." Underwood, 142 Hawai'i at 328, 418 P.3d at 669.  "When evidence is so overwhelming as to outweigh the inflammatory effect of the improper comments, reviewing courts will regard the impropriety as ultimately harmless."  Id. (internal quotation marks and citation omitted).  But "[w]hen it cannot be said beyond a reasonable doubt that the same result would have been reached absent the improper conduct . . . the defendant's conviction must be vacated."  Id.  Critically, we noted that "[w]hen a conviction is largely dependent on a jury's determination as to the credibility of a complainant's testimony, [] the evidence of the offense is not so overwhelming that it renders the prosecutor's improper statements harmless beyond a reasonable doubt."  Id. at 325, 418 P.3d at 670 (internal quotation marks and citation omitted).  Where the complaining witness' account of the events is countered only by the defendant, the potential for prejudice is especially heightened when prosecutorial

33

conduct affects the defendant's credibility.  Id. (noting that the defendant's conviction was "ultimately dependent on the jury's assessment of [the complaining witness'] credibility" because "only the statements of [the complaining witness] herself directly described the actual acts constituting the two offenses").

In this case, it cannot be said that the prosecutor's use of undisclosed and previously barred evidence and inflammatory questioning of witnesses "did not contribute to the jury's determination of guilt."  Pasene, 144 Hawai'i at 371, 439 P.3d at 896.  As in Underwood, here, T.Y., the complaining witness, was the only witness other than the defendant who could describe the actual acts constituting the offenses.  Thus, T.Y.'s testimony constituted the most significant evidence against Williams.  The evidence against Williams was not so overwhelming that it rendered the prosecutor's misconduct-- improperly referencing and introducing evidence that had been excluded by the defense's pretrial motion in limine, improperly introducing statements by Williams that had not been previously disclosed to the defense, and improperly subjecting defense witnesses to inflammatory questioning--harmless.  Because there is a reasonable possibility that the prosecutor's misconduct might have contributed to Williams' conviction, the misconduct was not harmless beyond a reasonable doubt.

34

After considering the inflammatory nature of the prosecutor's misconduct, the lack of prompt curative instructions from the circuit court, and the relative weight of the evidence supporting Williams' conviction, we find that the cumulative effect of the prosecutor's misconduct created an "atmosphere of bias and prejudice" that deprived Williams of a fair trial.  Pasene, 144 Hawai'i at 364, 439 P.3d at 889.  The circuit court erred in denying Williams' motion for a new trial based on prosecutorial misconduct, and the ICA erred in concluding that the prosecutor's misconduct was harmless.

**B.   The Circuit Court Did Not Abuse Its Discretion When It Limited the Number of Witnesses Who Could Testify on Williams' Behalf.**

Williams alleges the circuit court abused its discretion by limiting the number of witnesses permitted to testify on Williams' behalf.  When a decision to allow a witness to testify is based on Hawai'i Rules of Evidence ("HRE") Rule 403 (2016),[14] it "require[s] a 'judgment call' on the part of the trial court, [and is] reviewed for an abuse of discretion."  Richie, 88 Hawai'i at 37, 960 P.2d at 1245 (quoting State v. Arceo, 84 Hawai'i 1, 11, 928 P.2d 843, 853 (1996)).  "An abuse of

---

[14]   HRE Rule 403 states, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

discretion occurs when the decisionmaker exceeds the bounds of reason or disregards rules of principles of law or practice to the detriment of a party." State v. Vliet, 95 Hawai'i 94, 107, 19 P.3d 42, 55 (2001) (quoting In re Water Use Permit Applications, 94 Hawai'i 97, 183, 9 P.3d 409, 495 (2000)).

In the present case, the circuit court did not abuse its discretion in limiting the number of defense witnesses. The defense sought to call ten witnesses other than the defendant, seven of whom were non-family members. Of the six witnesses permitted to testify, three were the defendant's family members and three were non-family members. Of the three non-family witnesses, two testified as to Williams' good character,[15] and all were women. All four witnesses excluded by the court were male non-family character witnesses.

Williams raises particular concern before this court that no male non-family character witnesses were permitted to testify. However, defense counsel did not voice this specific concern at trial when defense witnesses were being finalized.[16]

---

[15]     The third female non-family witness was Autumn Butler, a friend of J.W.'s (Williams' daughter) who also knew T.Y., who was permitted to testify that T.Y. was jealous of J.W.

[16]     For example, the circuit court permitted one character witness to testify as to Williams' interaction with children. The defense selected Malia Ka'ai-Barrett, a female non-family member who had observed Williams with kids through his involvement with the Hawai'i Youth Opera Chorus. If the defense wished to have a male non-family character witness, it could have selected a potential witness who, according to the defense's witness list, had also observed Williams "regularly interacting with children" and who knew
(continued . . .)

And the record does not evince a basis to conclude that gender was a factor relevant to character testimony, or that the court's exclusion of these witnesses was based on their gender.[17] In fact, at trial, defense counsel conceded, "We probably don't need the boy," while referring to one of the male non-family character witnesses[18] that Williams now argues the circuit court arbitrarily excluded. Defense counsel also posited that the testimony of a second male non-family witness[19] would largely mirror that of the first male non-family witness:

> [DEFENSE]: [ ] There are actually two [male non-family witnesses], but they're basically going to testify that there were many opportunities for Mr. Williams to have molested them or engaged in inappropriate behaviors with them. And that didn't happen, and they've basically received no information or no reports that that ever happened.

Significantly, these concessions by defense counsel occurred before the circuit ruled, on relevance grounds, that it

---

(continued . . .)
Williams through New Hope Church, in lieu of Ka'ai-Barrett. However, the defense did not propose this person as a witness.

[17] Defense counsel did argue that it was important to have "a couple of" non-family witnesses to "corroborate" the testimony of the family witnesses. The defense was concerned that the prosecutor would imply to the jury that the family witnesses "ha[d] a motive to lie" simply because "they're related to Mr. Williams and they love him." However, the defense did not specify that they wanted male non-family witnesses to testify, and, as noted above, several female non-family witnesses testified at trial.

[18] According to the defense's witness list, this proposed witness was the son of a family friend who had "been in and out of the [Williams] house ever since he was a little boy."

[19] According to the defense's witness list, this proposed witness was a friend of Williams' son "who spent significant time in the Williams' family home including time alone with [Williams] and occasions when [T.Y.] was present."

37

would not permit the first male non-family witness to testify. As defense counsel identified his list of proposed character witnesses, the circuit court primarily expressed concern over the growing number of witnesses and that the character evidence was "becoming cumulative."

Under HRE Rule 403, it is within the court's discretion to exclude the "needless presentation of cumulative evidence." "In order for evidence to be considered 'cumulative' for HRE [Rule] 403 purposes, it must be substantially the same as other evidence that has already been received." State v. Pulse, 83 Hawai'i 229, 247, 925 P.2d 797, 815 (1996) (citing Aga v. Hundahl, 78 Hawai'i 230, 241, 891 P.2d 1022, 1032 (1995)). Thus, it was within the court's discretion to exclude cumulative evidence by limiting the number of witnesses who were all testifying as to the same character traits. Aga, 78 Hawai'i at 241, 891 P.2d at 1033 (finding it was not an abuse of discretion to exclude the deposition testimony of a second doctor regarding the decedent's alleged hallucinations because such testimony did not "offer a different opinion" than that already presented at trial and "could be considered cumulative evidence"); see also U.S. v. Dredd, 833 F. App'x 79, 81 (9th Cir. 2020) (noting that the trial court "has latitude to exclude cumulative character witnesses").

Here, five of the six non-family character witnesses the defense sought to call would have testified as to Williams' "honesty and integrity."  All six witnesses would have testified as to Williams' "nonviolent and non-aggressive character" and "the absence of any indications of sexual deviancy or behaviors" consistent with the allegations in this case.  Nothing in the record indicates the four excluded witnesses would have offered a "different opinion" on Williams' character than that attested to by the witnesses the court permitted to testify; they would have testified as to the same character traits in different interpersonal settings.[20]  The court's exclusion of these witnesses did not prevent the defense from supporting the character of the defendant, nor did it prevent testimony that would supply a fact not available from other witnesses.  Because the testimony of the four excluded witnesses would have been "substantially the same as other [character] evidence" offered at trial, Pulse, 83 Hawai'i at 247, 925 P.2d at 815, the circuit court's exclusion of these witnesses was not an abuse of discretion.

---

[20]  For example, two of the excluded male non-family character witnesses, along with Laura Morgan, who was permitted to testify, were listed as "long time family friend[s]" of the Williamses.  Another excluded male non-family character witness was Williams' "professional colleague."  All of these witnesses would have offered similar opinion testimony as to Williams' character.

## C.    Sufficient Evidence Existed to Convict Williams.

"This court will not overturn a conviction by a jury if viewing the evidence in the light most favorable to the prosecution, there is substantial evidence to support the conclusion of the trier of fact." Tetu, 139 Hawai'i at 226, 386 P.3d at 863 (quotation marks and brackets omitted). "Substantial evidence is credible evidence which is of sufficient quality and probative value to enable [a person] of reasonable caution to support a conclusion." State v. Matavale, 115 Hawai'i 149, 158, 166 P.3d 322, 331 (2007).

In the present case, there was substantial evidence to convict Williams. The jury heard testimony from T.Y. that Williams sexually assaulted him while he was a minor. State witnesses S.S. and C.O. also testified as to their observations of T.Y.'s emotional, nervous, and fidgety behavior when T.Y. told them about the alleged assault. C.Y. testified as to the changes in T.Y.'s behavior, including the decline in his academic performance, during and after the alleged time frame that the abuse occurred. Although Williams denied committing the assault and several defense witnesses testified as to his good reputation it is within the jury's purview to believe one witness over another. See State v. Jhun, 83 Hawai'i 472, 483, 927 P.2d 1355, 1366 (1996) ("In a jury trial, the jury is the trier of fact and, thus, is the sole judge of the credibility of

the witnesses and the weight of the evidence."). Thus, in viewing the evidence in the light most favorable for the prosecution, substantial evidence supported Williams' conviction.

## IV. CONCLUSION

For the foregoing reasons, the ICA's March 3, 2020 judgment on appeal is vacated, the circuit court's order denying Williams' motion for a new trial is vacated, and the case is remanded to the circuit court for further proceedings consistent with this opinion.

Eric A. Seitz,
(Della Au Belatti,
Gina Szeto-Wong,
Jonathan M.F. Loo, and
Kevin A. Yolken, with him
on the briefs) for
petitioner/defendant-appellant

Sonja P. McCullen for
respondent/plaintiff-appellee

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Michael D. Wilson

/s/ Gary W.B. Chang

